## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

BANCRÉDITO HOLDING CORPORATION,
on its own behalf and derivatively for the
benefit of and on behalf of Nominal Defendant
BANCRÉDITO INTERNATIONAL BANK &
TRUST CORPORATION,

                Plaintiff,

        vs.

DRIVEN ADMINISTRATIVE SERVICES
LLC,

                Defendant,

            and

BANCRÉDITO INTERNATIONAL BANK &
TRUST CORPORATION,

            Nominal Defendant.

Case No.:_____

**VERIFIED DIRECT AND DERIVATIVE
SHAREHOLDER COMPLAINT**

**JURY TRIAL DEMANDED**

Bancrédito Holding Corporation ("**Plaintiff**" or "**BHC**"), *sole shareholder of nominal*
defendant Bancrédito International Bank & Trust Corporation ("**Bank**" or "**Bancrédito**"), brings
the following Verified Direct and Derivative Shareholder Complaint individually and derivatively
for the benefit, on behalf and in the right of the Bank against Defendant Driven Administrative
Services LLC ("**Defendant**" or "**Driven**"). Plaintiff, upon direct knowledge with respect to itself
and its actions and otherwise on information and belief, alleges as follows:

### INTRODUCTION

Defendant was appointed as receiver to the Bank by its regulator, the Office of the
Commissioner of Financial Institutions of Puerto Rico ("**OCIF**"). The conditions of its
appointment, set out in the Complaint and Order of Interim and Permanent Appointment of

Receiver and Revocation of License (*Querella y Orden de Nombramiento Provisional y Permanente de Síndico y Revocación de Licencia*) ("**Receivership Order**"), attached as **Exhibit A**, expressly provide that, Defendant occupies a position analogous to that of the Bank's management and board of directors prior to the receivership and, concomitantly, owes fiduciary duties to the Bank and its sole shareholder, Plaintiff.

In direct contravention of those duties, Defendant: (i) refused to communicate with Plaintiff, (ii) provided inaccurate information to Plaintiff, (iii) refused to give Plaintiff access to critical information about the Bank's financial situation, (iv) excluded Plaintiff from its negotiations with FinCEN, and (v) made admissions that are not only directly adverse to the Bank's and Plaintiff's interests but are also factually incorrect and unsupported by the evidence that should have been considered had Defendant simply accessed the information Plaintiff sought to provide. As a direct consequence of Defendant's actions, the Bank and Plaintiff are faced with harm, including but not limited to, a $15 million civil money penalty imposed by FinCEN.

To ensure that Driven did not cause any further harm, Plaintiff filed a lawsuit in the Eastern District of North Carolina on October 12, 2023. While it was pending, Plaintiff learned that Driven may be attempting to sell the Bank's rare, hand-selected and extremely valuable art collection (the "**Artwork**"). The Plan of Liquidation and Dissolution of Bancrédito International Bank & Trust Corporation ("**Liquidation Plan**"), further described below, states that all of the Bank's assets remaining after the liquidation are to be returned to Plaintiff. In blatant disregard for its safekeeping, Driven has stashed this Artwork in crates in a vacant and potentially unsecured office, under conditions that seem inadequate for its proper preservation. Driven's failure to protect the Artwork is a further example of how Driven operates negligently and in breach of its fiduciary duty.

Given these failures, on January 4, 2024, Plaintiff filed a Motion for Temporary Restraining Order ("**TRO**") and Preliminary Injunction in the Eastern District of North Carolina to: (i) enjoin Driven from selling, transferring, damaging, or otherwise disposing of the Artwork; and (ii) mandate that Driven specify how it is appropriately caring for the Artwork while in its possession.

On January 9, 2024, the action in the Eastern District of North Carolina was dismissed without prejudice on personal jurisdiction grounds. The Court did not reach a decision on the TRO. The Court stated: "Given the immediacy of the harm alleged by Plaintiff in the motion for restraining order, the court's analysis of Defendant's motion to dismiss is limited to the issue of personal jurisdiction, so that Plaintiff may, if it so chooses, timely seek relief in an alternative forum. *See* Fed. R. Civ. P. 1." *Bancrédito Holding Corp. v. Driven Admin. Servs., et al.*, Case No. 5:23-cv-00575-M-BM, ECF No. 23 at 2 (E.D.N.C. Jan. 8, 2024). For the reasons set forth below, Plaintiff seeks relief in this forum to ensure that Driven does not cause any further harm. Plaintiff simultaneously files a Motion for TRO and Preliminary Injunction to prevent Driven from taking actions related to the Artwork that would cause Plaintiff irreparable harm.

## PARTIES

1.      Plaintiff BANCRÉDITO HOLDING CORPORATION is a New York corporation that owns all the capital stock of the Bank. Plaintiff's principal place of business is Florida.

2.      Defendant DRIVEN ADMINISTRATIVE SERVICES LLC is a limited liability company formed under the laws of Puerto Rico that is a financial advisory firm. Defendant's sole member is another Puerto Rico limited liability company—Driven P.S.C.—that, in turn, has five members, all of whom are residents of Puerto Rico. Driven's principal place of business is Puerto Rico.

3

3.     Nominal Defendant BANCRÉDITO INTERNATIONAL BANK & TRUST CORPORATION is a Puerto Rico corporation that at relevant points in time prior to getting into receivership held an international banking entity ("**IBE**") license to provide financial services to persons who are not residents of Puerto Rico, including personal, private, institutional, and corporate banks in the United States and abroad.

4.     Plaintiff was the Bank's sole shareholder at all times relevant to the allegations herein and remains the Bank's sole shareholder.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  The parties are citizens of different states, and the matter in controversy exceeds $75,000.

6.     This Court has personal jurisdiction over Defendant because it is a Puerto Rico limited liability company, whose sole member is another Puerto Rico limited liability company that, in turn, has five members, all of whom are residents of Puerto Rico.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant and the Bank reside in Puerto Rico.

8.     There is no need for Plaintiff to first bring this action before OCIF and exhaust its administrative remedies.

## FACTUAL ALLEGATIONS

### A.     The Bank's Inception, Development of AML Compliance Efforts, and Regulator Relationship

9.     The Bank was incorporated in 2008 pursuant to the Puerto Rico General Corporations Act.  Plaintiff, a New York corporation, has been the Bank's sole shareholder at all times relevant to the allegations herein.

4

10.     As part of its normal operations, the Bank established compliance programs, including anti-money laundering ("**AML**") policies, procedures, and internal controls. Standard AML procedures—which the Bank implemented—involve establishing protocols for review of certain transactions for suspicious activity and filing reports of suspicious activity known as suspicious activity reports ("**SARs**") with the U.S. Department of the Treasury pursuant to 31 C.F.R. § 1020.320.

11.     The Bank was granted a license as an IBE under the Puerto Rico International Banking Center Regulatory Act [Act No. 52 of August 11, 1985, as amended] (the "**IBE Act**"). As such, OCIF regulates, supervises, and examines the Bank and other similarly situated financial institutions that are organized under the laws of the Commonwealth of Puerto Rico.

12.     For example, during regular intervals while the Bank was authorized to conduct a depository institution business pursuant to its license as an IBE, OCIF examined the Bank's credit and other financial services functions and its compliance with the applicable provisions of the Bank Secrecy Act ("**BSA**"), which is the principal AML law of the United States. During such examinations, the Bank promptly provided relevant information in response to OCIF's requests.

13.     Additionally, the Bank and OCIF entered into a Memorandum of Understanding on December 21, 2021 (the "**2021 MOU**"), in which the Bank agreed to certain AML program improvements, including organizing a Special BSA Directors Committee ("**Special Committee**") to oversee the Bank's compliance programs; to conduct an independent look-back review for a five-year period of substantially all of its customers' transactions for AML compliance purposes (the "**Look-Back**"); and to pay an administrative money penalty for a total amount of $97,000—in stark contrast to the $15 million penalty imposed by FinCEN in response to what is essentially the same conduct.

5

14.     The Look-Back entailed a thorough review of the Bank's past records and procedures within the parameters discussed in paragraph 21 below. The Bank retained a highly credentialed third-party consultant ("**Consultant**") to conduct the Look-Back. The Consultant found that the Bank's customer risk rating methodology properly identified higher-risk customers. Moreover, the data showed that Bancrédito filed multiple SARs for those customers identified as high-risk.

**B.    The Bank's Substantial BSA/AML Compliance**

15.     The Bank engaged an independent and highly credentialed independent audit firm ("**Firm One**") to conduct a thorough review of its BSA/AML and sanctions compliance programs and to provide a report and recommendations. Firm One conducted a review for the years 2019 and 2020, then issued detailed audit reports regarding the BSA/AML compliance program of the Bank.

16.     The 2020 report of Firm One gave the Bank's BSA/AML compliance program its second-highest rating: "fair," meaning that "no significant errors or material violations of law or BSA/AML" were observed.

17.     Noting improvement, a year later, in its 2021 report, the same independent audit firm upgraded the Bank's rating to "satisfactory," the highest rating available.

18.     Concurrent with its engagement of Firm One, the Bank engaged another independent and highly credentialed independent audit firm ("**Firm Two**"), to complete BSA/AML compliance audit reviews for the calendar years 2020 and 2021, and to validate the prior review conducted by Firm One in 2020 and confirm that the Bank had earned a "satisfactory" rating.

19.     Firm Two ultimately gave the Bank the highest available rating of "satisfactory" for both years.

6

20.    In 2022, the Bank additionally engaged the Consultant—approved by OCIF—to conduct the Look-Back.

21.    The Consultant's Look-Back parameters called for the review of "(a) all customer (individual and entities) accounts and transactions in excess of $2,500; and (b) all accounts and transactions from foreign correspondent accounts in excess of $2,500" from January 1, 2016 to December 31, 2020.

22.    On April 8, 2022, the Bank provided OCIF with a copy of the Consultant's proposed Look-Back plan, which set out the scope, parameters, number of accounts, and transactions expected to be reviewed. On May 10, 2022, OCIF approved the Look-Back plan.

23.    As is detailed further below, while the Bank was in sound financial condition, in August 2022, Plaintiff, the Bank, and OCIF "entered into a voluntary" Liquidation Plan as part of a settlement related to the Bank's compliance with the MOU. The Liquidation Plan "terminate[d], substitute[d], and supersede[d] the MOU, except for the provisions of the [Look-Back]." The Look-Back was completed on or around November 2, 2022.

24.    The Consultant's review concluded that the Bank's BSA/AML customer risk rating methodology properly identified higher-risk customers.

25.    The review identified certain transactions that raised indicia of suspicion but did not include a recommendation that the Bank file SARs on said transactions.

### C.    The Bank's Liquidation Plan and Efforts to Effectuate It

26.    Upon information and belief, the financial condition of the Bank at all times prior to the appointment of Driven as receiver was sound, its asset quality was good, and its capital position was strong.

27.    In or around April 2022, certain members of the Bank's board of directors ("**Board of Directors**"), who were serving on the Special Committee mandated by the 2021 MOU,

7

unexpectedly resigned, hindering the Bank's ability to comply with that obligation of the 2021 MOU.

28.    Upon information and belief, the Bank promptly contacted OCIF, seeking its guidance and requesting a meeting to discuss how to fill the Special Committee's vacancies in the 2021 MOU by OCIF's imposed deadline. Although a meeting was scheduled to discuss the Special Committee's vacancies on or around May 12, 2022, OCIF cancelled this meeting on May 12 without providing an explanation.

29.    On or around May 16, 2022, OCIF filed legal proceedings against the Bank, alleging breach of obligations set forth in the 2021 MOU solely related to the establishment of the Special Committee.

30.    To settle that matter, in August 2022, Plaintiff, the Bank, and OCIF entered into the voluntary Liquidation Plan for the Bank. The negotiation of the Liquidation Plan was made possible by Plaintiff, whose counsel engaged with OCIF in discussions related to the voluntary liquidation of the Bank. Through the course of those negotiations, OCIF provided drafts of the Liquidation Plan for review and comment.

31.    The Liquidation Plan appointed Driven as administrator for the Bank during the liquidation process. As administrator, Driven was charged with paying and discharging "all liabilities and obligations" of the Bank.

32.    After Driven was appointed as administrator, the Bank's Board of Directors and Officers continued in their roles. As service provider to the Bank, Driven answered to the Bank and its management.

33.    On September 20, 2022, OCIF sent a letter to Plaintiff's counsel asking that the Bank and Plaintiff assist in expediting the liquidation process.

34.     In compliance with the request, Plaintiff and the Bank endeavored to provide material assistance in expediting and completing the Liquidation Plan.

35.     Specifically, OCIF requested assistance executing the part of the Liquidation Plan that required Driven to pay certain depositors the money they held in their Bancrédito accounts within the first thirty (30) days of the Liquidation Plan's effect.

36.     Accordingly, Plaintiff contacted Berkeley Bank & Trust Limited ("**Berkeley**") in the United Kingdom.  Berkeley had an account with the Bank that contained a large sum of money and was entitled to the deposits in the Bank's account within the first thirty (30) days of the Liquidation Plan's execution.

37.     A significant portion of the money in Berkeley's Bancrédito account resulted from the maturity of certain U.S. Treasury Bills belonging to Bancrédito.

38.     Plaintiff therefore requested that Berkeley transfer funds to the Bank's account at a different bank in Puerto Rico.  Berkeley followed Plaintiff's instructions and executed the required transfer authorization, while also requesting that the Bank return to it the remaining balance in the account (about $1.3 million) as required under the Liquidation Plan.  The Bank, through Defendant, agreed to repay Berkeley.

39.     Despite Berkeley's performance under the agreement, and in direct violation of the Liquidation Plan, Driven failed to repay Berkeley.

40.     Upon information and belief, Driven failed to inform Plaintiff of this default. Plaintiff only learned of the default after OCIF placed a hold on the Bank's transfers that would last until all of the Bank's funds were transferred to two separate banks—a condition that was not part of the Liquidation Plan.

41.     Driven's actions not only caused the Bank to breach its obligations to Berkeley under the Liquidation Plan—which breach led to Berkeley filing suit against the Bank—but they also stalled the liquidation process because Driven was no longer able to pay the depositors, as explained in Paragraphs 35 and 36.

42.     Driven's breach of the Liquidation Plan further exposed the Bank to civil liability because (i) Berkeley subsequently filed suit in the U.S. District Court of Puerto Rico, seeking declaratory relief and payment of $1.3 million; and (ii) Driven's failure to timely transfer the $26 million that Berkeley held for Bancrédito set Bancrédito behind in its ability to repay other depositors.

**D.    OCIF's Appointment of Driven as Receiver**

43.     On or about January 11, 2023, OCIF issued the Receivership Order (i) revoking the Bank's IBE license and (ii) placing the Bank into receivership, designating Driven as its receiver ("**Receiver**").

44.     As Receiver, Driven assumed—with full knowledge—control of the Bank's assets and liabilities and assumed the role of the Bank's Board of Directors and Officers.

45.     In some circumstances, the appointment of a receiver is appropriate because a company has limited resources and cannot adequately maximize its own financial resources.

46.     However, in this case, the Bank had about $30 million at its disposal in foreign accounts under the Bank's name, which was three times the amount necessary to liquidate the Bank's debts.  Despite this, OCIF issued its Receivership Order, which alleged that BHC was impeding the Board of Directors of BHC from moving forward with the Liquidation Plan. Pursuant to the terms of the Receivership Order, Driven's primary directive was to "complete . . . the Liquidation Plan." Complaint and Order of Interim and Permanent Appointment of Receiver and Revocation of License (*Querella y Orden de Nombramiento Provisional y Permanente de*

10

*Síndico y Revocación de Licencia*) at 6, *Off. Comm'r Fin. Insts. v. Bancrédito Int'l Bank & Trust, Corp.*, C-23-D-001 (OCIF Jan. 11, 2023) [attached hereto as **Exhibit A**, which is a certified translation of the original filing in Spanish].

47.     Driven was provided "flexibility in its mandate, to be able to handle situations not expressly detailed in the Liquidation Plan." *Id.*

48.     For example, Driven was given the "power to . . . vindicate [the Bank's] rights over its property and assets" and "appoint agents to carry out these mandates and take any other action that [the Bank] would have been able to do and that is necessary and appropriate." *Id.*

49.     Critically, the Receivership Order expressly stated that:

> [Defendant] will be in a position similar to the one that the management and directors of [the Bank] held prior to the receivership. Therefore, the management and directors of [the Bank] are ordered to place the Receiver in control of the [B]ank so that the Receiver, advised by any professionals that it deems necessary, may complete the remaining processes to finalize the liquidation of [the Bank].

*Id.* at 6–7.

50.     More specifically, the Receivership Order made clear that "[a]s part of said mandate, the Receiver will have a fiduciary duty both to [the Bank's] creditors as well as to [the Bank's] Shareholder"—that is, Plaintiff. *Id.* at 7.

### E.     Driven's Early Disregard for Its Duties of Disclosure and Due Care

51.     Even though most of the liquidation had been completed prior to the appointment of the Receiver, the Receiver was tasked with finalizing the liquidation.

52.     As part of its work, the Receiver had the discretion to select an escrow agent and open an escrow account to hold and secure the Bank's funds.

11

53.     That discretion was subject to specifically negotiated terms and conditions, pursuant to a Settlement Agreement entered into in March 2023 among Plaintiff, the Bank, and OCIF (the "**Settlement Agreement**") to resolve certain disputed aspects of the Receivership Order.

54.     The Settlement Agreement stated that the Receiver must retain an escrow agent that qualifies as "a reputable agency or financial institution or [sic] such as the Royal Bank of Canada or similar." This condition was critical to Plaintiff because it wanted to ensure the Bank's cash was at a world-renowned depository institution.

55.     Instead of complying with this specific condition to retain as escrow agent a depository institution similar to Royal Bank of Canada ("**RBC**"), Driven retained a trust company called Apex Corporate Trustees (UK) Limited ("**Apex**") to serve as the escrow agent.

56.     By way of illustration, RBC has over 97,000 employees who serve 17 million clients in 29 countries. RBC's revenue ranges in the billions, making it the eleventh-largest depository institution in the world. In contrast to RBC, as of December 31, 2022, Apex had 52 employees and less than $3 million in revenue. Thus, under any fair reading of the explicit condition regarding the placement of the Bank's funds, Apex could not be considered "similar" to RBC.

57.     By engaging Apex as escrow agent, Driven not only breached its fiduciary duty of care and good faith to the Bank and its Shareholder; it also breached the Settlement Agreement.

58.     Moreover, the Receiver did not provide sufficient detail about the appointment of Apex in its March 29, 2023 communication, which notified Plaintiff that the Bank's funds would be transferred to an escrow account maintained at Lloyds Bank plc in London, England. In said notice, the Receiver failed to disclose who was the escrow agent and whose name the account was

under, thereby misleading Plaintiff to believe that Lloyds Bank—a better-regarded financial institution than Apex—was the escrow agent.

59.      When Plaintiff learned that Apex was the escrow agent, Plaintiff raised concerns about its rating.

60.      On April 24, 2023, Plaintiff's attorneys sent Driven's attorney an email noting the fiduciary duties that Driven owed to the Bank under the Receivership Order and requesting that Driven provide basic financial information.  The email indicated that "the Receiver must comply with such fiduciary duties owed to the sole shareholder, that at the very least require transparency with the sole shareholder."  The email also cited Puerto Rico's General Corporations Act, which provides Plaintiff, as the Bank's sole shareholder, the right to inspect the Bank's books and records.

61.      Driven's attorney never responded.

62.      On May 1, 2023, Plaintiff again contacted Driven's attorney, making a formal request under Article 7.10 of the Puerto Rico General Corporations Act of 2009, as amended, for the Bank's audited financial statements for the preceding year.

63.      Driven's attorneys responded on May 9, 2023, stating that Driven requested an extension from OCIF until May 31, 2023 to prepare the Bank's audited financial statements and that a copy of said statements would be provided to Plaintiff once finalized.

64.      In fact, the information requested was never provided despite Plaintiff's repeated follow-up requests to inspect the Bank's books and records.

**F.**      **Driven's Refusal to Respond to Formal Record Requests**

65.      The Receivership Order expressly provides, as noted, that the Receiver shall be in a position analogous to that of the management and the Board of Directors prior to the receivership.

66.      The Receivership Order also provides that the Receiver "shall have a fiduciary duty to . . . the Shareholder of [the Bank]," which was—at all times relevant hereto—Plaintiff.

13

67.    As the sole shareholder, Plaintiff has a right to the Bank's books and records. Because Driven was appointed to assume the role of the Bank's Board of Directors, Driven is required to fulfill requests for books and records.

68.    Despite those responsibilities and obligations, Driven has refused to comply with Plaintiff's repeated requests to inspect the Bank's books and records.

69.    Plaintiff asked Defendant on several occasions for access to the Bank's books and records.

70.    As one example, on May 1, 2023, Plaintiff requested from Driven different documents, including audited financial statements and monthly budgets.

71.    These documents would have helped Plaintiff (i) determine the current value of the Bank; (ii) determine the costs and expenses of the liquidation and receivership; (iii) clarify discrepancies in information previously provided by the Bank; and (iv) evaluate any potential mismanagement or waste.

72.    On May 9, 2023, Driven formally declined Plaintiff's request on the basis that Plaintiff did not have a right to the information, but Driven did not address the fact that it owed a fiduciary duty to Plaintiff under the terms of the Receivership Order.

73.    Defendant declined all similar attempts by Plaintiff to obtain the Bank's books and records.

74.    To this day, Driven has failed to provide the requested documentation.

75.    After the commencement of the litigation in the Eastern District of North Carolina, on December 4, 2023, Plaintiff's counsel sent a letter ("December 4 Letter") via electronic mail to Driven's counsel requesting confirmation within seven (7) business days of receipt that Driven was preserving all Bank-related documentation originating from Driven or from the Bank itself.

76.     Driven's counsel who appeared in the Eastern District of North Carolina litigation did not respond within seven (7) business days of receipt and, to date, still has not directly responded to the December 4 Letter request related to the document preservation.

77.     By failing to provide that information to the Plaintiff as its sole shareholder, Driven has failed to meet its duty of loyalty to Plaintiff.

78.     Driven is additionally hiding critical information that may allow Plaintiff to fully determine whether the Receiver has incurred corporate waste.

### G.    FinCEN's Involvement and Driven's Refusal to Involve Plaintiff

79.     On or around mid-November 2019, FinCEN commenced an investigation of the AML compliance program of the Bank. Upon information and belief, the documents and evidence that FinCEN relied on to support its investigation were largely based on and/or obtained from OCIF's examinations.

80.     Upon information and belief, the Bank retained McConnell Valdés LLC ("McV") in to negotiate with FinCEN.

81.     After Driven was appointed Receiver, Driven—through its counsel at McV—engaged in negotiations with FinCEN on behalf of the Bank.

82.     Upon information and belief, McV advised the Bank regarding the filing of SARs and other compliance-related issues.

83.     Upon information and belief, since at least early December 2022, FinCEN and Driven (first as administrator and then as Receiver)—through its counsel at McV—engaged in negotiations to address FinCEN's regulatory concerns.

84.     Given Plaintiff's status as the sole shareholder of the Bank, and concomitant knowledge regarding the issues and/or allegations in FinCEN's investigation, Plaintiff offered on several occasions to assist the Receiver during the course of its settlement negotiations.

85.    Around this time, the Bank's former counsel also had at least two calls with the Receiver to share its work product from separate 2017 and 2018 independent reviews of the Bank's BSA/AML program.  On the calls, the Bank's counsel actively tried to help the Receiver marshal evidence to explain the Bank's BSA/AML processes to FinCEN.  The reviews contained recommendations that the Bank take steps to decrease its risk appetite, which the Bank took immediate steps to act upon.  The subsequent Look-Back reported in relevant part that the Bank, after taking these actions, engaged in materially less high-risk transaction activity, not more. In contrast, FinCEN's reported findings, which Plaintiff admitted, claimed that the Bank's AML program deteriorated over time, and the Bank subjected the United States to ever-increasing levels of risk, not less.

86.    The reviews, corroborated by the results of the Look-Back review, show that the Bank's BSA/AML procedures got better over time, not worse, and, for the same reasons, the Bank consequentially subjected the United States to less risk.

87.    Instead, Driven consistently and willfully failed to (a) include the Bank and Plaintiff in its discussions; (b) provide the Bank and Plaintiff with updates of its dealings with FinCEN; or (c) even bother to obtain the critical information Plaintiff possessed and sought to provide Defendant that would have helped resolve FinCEN's concerns or, at a minimum, ensured that Defendant was operating from the correct set of facts in dealing with FinCEN on behalf of, and as fiduciary for, Plaintiff.

88.    Driven also intentionally ignored or otherwise rejected Plaintiff's repeated offers to participate in the negotiations with FinCEN.

89.     Had Plaintiff been permitted to participate—or at least been able to provide Driven and FinCEN with the necessary and crucial information Driven lacked—it would have ensured the best possible outcome for the Bank to resolve FinCEN's AML compliance investigation.

90.     In fact, Driven never provided Plaintiff with any written drafts of the Consent Order (as defined below), leaving Plaintiff (i) without information as to the form and substance of what would become of the Consent Order, and (ii) unaware of the incomplete and—in many areas false—set of facts to which Driven would ultimately "admit" in the Consent Order.

91.     Had Driven engaged with Plaintiff in connection with the Consent Order negotiations, Plaintiff would have provided information that contradicted numerous assertions in the Consent Order—and Driven would not have ultimately agreed to the Consent Order's contentions.

92.     As detailed below, failing to engage with Plaintiff in this regard and entering into the Consent Order on an uninformed basis was a breach of Driven's fiduciary duties and harmed both the Bank and Plaintiff.

**H.     The FinCEN Consent Order**

93.     On September 15, 2023, FinCEN issued its Consent Order Imposing Civil Money Penalty (the "**Consent Order**") against the Bank, imposing a $15 million civil money penalty.

94.     Driven consented to and approved the Consent Order without Plaintiff's consent.

95.     Plaintiff was unaware that the Consent Order would be issued that day, and Plaintiff had no idea it would include such a large fine.

96.     Driven caused the Bank to agree to pay a $15 million civil penalty and admit to an erroneous, incorrect, misleading, and harmful set of facts implicating the Bank and certain other parties.

17

97.     Based on information and belief, FinCEN's Consent Order mirrored the allegations of OCIF's 2021 MOU, which was issued prior to Driven's involvement and imposed a civil money penalty of $97,000.

98.     Agreeing to this excessive fine and admitting to this inaccurate set of facts without exercising even a modicum of due care—e.g., simply checking against the extensive information available to the Bank's sole shareholder to determine whether those facts were accurate—was an egregious breach of Defendant's fiduciary duties of care and loyalty.  It bordered on intentional neglect, and it severely and significantly damaged the Bank's reputation, exacerbated rather than improved its financial condition, and harmed both the Bank and Plaintiff in a significant manner.

1.      **The Consent Order's Erroneous Information Regarding the BSA/AML Program**

99.     FinCEN's Consent Order incorrectly contests the appropriateness of Bancrédito's AML program.  It states that FinCEN "identified tens of thousands of transactions by high-risk accountholders processed through Bancrédito's foreign correspondent accounts, representing hundreds of millions of dollars in transactions." Yet, when presenting "[t]he following examples" as "illustrative of Bancrédito's failure to establish an adequate correspondent account due diligence program," the order lists only *one* foreign correspondent account: AllBank Corporation ("**AllBank**").

100.    On this point, the Consent Order recounts facts that suggest AllBank permitted three clients with potentially suspicious ties to conduct transactions through its institution. FinCEN thus adequately described due diligence weaknesses in *AllBank's*—not *Bancrédito's*—compliance program.  Indeed, the Consent Order fails to state any facts regarding Bancrédito's due diligence on AllBank.

101.    This allegation is also contrary to the findings of the BSA/AML compliance reports issued by the independent audit firms referenced in Section B of this Complaint, which consistently rated Bancrédito's AML program as either "fair" or "satisfactory." It is also inconsistent with the Look-Back, which reviewed nearly 135,000 transactions and found that the Bank did not fail to file any necessary currency transaction reports.

102.    In entering the Consent Order, the Receiver agreed to a narrative that Bancrédito's AML program deteriorated over time, which ignores the findings of the AML compliance reports issued by the independent audit firms.

103.    The FinCEN Consent Order also erroneously states that Bancrédito failed to file SARs on "over $100 million in suspicious transactions." This statement might be based on a similar—but different—finding from the Look-Back.

104.    The Look-Back report found about $100 million in transactions—from customers for which the Bank had *already* filed SARs—that merited additional "escalation to the BSA Department." That is, the report found that Bancrédito should have *internally* followed up on these transactions. The report did not find that additional SAR filings were required for the transactions.

### 2.    The Consent Order's Erroneous Information Regarding SARs

105.    In the Consent Order, Driven agreed with FinCEN that there were "hundreds of millions of dollars in suspicious transactions on which . . . Bancrédito failed to file timely SARs." To illustrate this point, the Consent Order provides the examples of three individuals it denotes as Customers A, B, and C.[1]

---

[1]    Because the Receiver has consistently denied Plaintiff access to the Bank's records, Plaintiff responds only to the allegations of Customer C, but anticipates it could respond to other allegations if allowed to inspect the records (as is Plaintiff's right).

106.    Regarding Customer C, "a private investment company, created for the purpose of owning a luxury yacht, with an account at Bancrédito," the Consent Order states that "Executive A initiated a series of five transfers from [his private investment company ('**PIC**')] account to various payees totaling over $1.3 million . . . to make payments for the renovation of the yacht under the control of Customer C."

107.    It appears, from the Consent Order, that FinCEN concluded that the purchase and sale of the yacht did not have a lawful business purpose. However, a basic review of the documents available to the Bank would have caused the Bank to conclude that the transaction had a lawful business purpose and, as such, was not suspicious.

108.    It appears FinCEN did not have sufficient information—which could have and should have been provided by Driven—to make a determination about the issues with Customer C.

109.    Instead, the facts associated with Customer C are as follows:

(a)    In 2016, Jose Luis Arana Muñoz de Cote, a professionally licensed yacht broker-dealer, informed Executive A about M/Y PURE ONE, a 46-meter Leopard ("**PO Yacht**"). PO Yacht was subject to sequester, custody, and control of the Italian Bankruptcy Court in Pisa, Italy. Said court was in the process of having interested buyers submit offers to participate in a bid auction for the acquisition of PO Yacht.

(b)    Executive A appointed Mr. de Cote as his nominee and fiduciary in the auction process and instructed Mr. de Cote to submit a bid for PO Yacht on his behalf and to handle all matters and aspects relating thereto. This arrangement was memorialized into a Memorandum of Understanding on June 14, 2016 ("**2016 MOU**"). Specifically, the 2016 MOU appointed Mr. de Cote as Executive A's nominee, trustee, fiduciary, and attorney-in-fact for the acquisition and

management of PO Yacht.  The 2016 MOU also granted Mr. de Cote the right and power to utilize Executive A's funds to purchase PO Yacht if the bid was approved.

(c)　　The formal auction closing took place on August 21, 2016 and is evidenced by a Buyer's Auction Closing Statement listing the following particulars:

- Buyer: Mr. de Cote, as trustee for Executive A
- Seller: Tribunale Ordinario de Pisa, Sezione Esecuzione Mobiliari
- Vessel: WY PURE ONE, Leopard 46m
- Date of Auction Closing: August 21, 2016
- Signatories: (i) Mr. de Cote, as Trustee; and (ii) Executive A, as Beneficiary.

(d)　　Subsequent to PO Yacht's acquisition, Mr. de Cote coordinated and managed payment on behalf of Executive A for the inspections and extensive repairs the vessel required.

(e)　　Executive A and Mr. de Cote also entered into a Broker's Commission Agreement ("**BCA**"), which details that Mr. de Cote was to receive a commission for his efforts in assisting Executive A with the auction and repair process.  The BCA also ratifies the parties' 2016 MOU and vests title of PO Yacht in the name of Pure One Marine Corporation ("**POMC**").

(f)　　POMC was incorporated on October 20, 2016, with Executive A serving as its original Director, President, and Secretary.  Since its incorporation, POMC was wholly owned by Interocean Marine Corporation ("**Interocean**").  From October 20, 2016 through May 12, 2017, Mr. de Cote held ownership interest in Interocean for the benefit of Executive A, as evidenced by the transaction documents resulting in the purchase and sale of the PO Yacht.  On or about January 20, 2017, Mr. de Cote resigned from POMC, and on May 12, 2017, he ceased being the nominee shareholder of Interocean.

110.    These documents, physical copies of which Plaintiff provided to the Receiver before the Receiver entered into the Consent Order, prove that Executive A was the beneficiary of the transactions resulting in the purchase and sale of PO Yacht.

111.    Notably, the governing FinCEN SAR rule requires that a transaction be reported to FinCEN if, among other things, a bank has reason to suspect that

the transaction has no business or apparent lawful purpose or is not the sort of which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction *after examining the available facts*, including the background and possible purpose of the transaction.

31 C.F.R. § 1020.320 (a)(2)(iii) (emphasis added).

112.    Here, a basic review of the documents available to the Bank (or that the Bank could have obtained by engaging Plaintiff) would have caused the Bank to conclude that the transaction had a lawful business purpose (i.e., the purchase and sale of the PO Yacht for the benefit of Executive A). For example, as noted above:

(a)     The Buyer's Auction Closing Statement ("**Closing Statement**") explicitly states that the Buyer was Mr. de Cote "as trustee for" Executive A. The Closing Statement is also signed by both Executive A "as Beneficiary" and Mr. de Cote "as Trustee."

(b)     The 2016 MOU memorializes, among other things, the appointment of Mr. de Cote as Executive A's "nominee, trustee and fiduciary to participate in the live auction at the bankruptcy court of Pisa, Italy and to carryout [Executive A's] instructions with regard to" the PO Yacht.

(c)     The 2016 MOU also provides that Mr. de Cote will execute "all documents reasonably necessary to transfer all shares in that certain corporation named 'Interocean Marine Corporation' . . . , which shall be transferred and fully vested in [Executive A's] name."

22

(d)     Significantly, an insurance certificate, issued on October 19, 2016, covering the PO Yacht named Executive A as an "Additional Assured(s)" and specifically listed Executive A as the owner and loss payee.

113.    The facts set forth above, although not exhaustive, illustrate that the transactions evidenced by such documents did not warrant a SAR because there was nothing suspicious about the purchase and sale of the PO Yacht.

114.    By entering into the Consent Order, Driven admitted to erroneous facts such as these—that it should have known were untrue—and breached its fiduciary duty.

**I.      Driven's Flagrant Disregard for Its Fiduciary Obligations**

115.    Moreover, Driven has continuously denied Plaintiff access to the Bank's books and records in order to prevent Plaintiff from uncovering and learning the extent to which the Receiver has grossly mismanaged the Bank's finances.

116.    Because the Receiver has refused to permit Plaintiff to inspect the Bank's books and records, Plaintiff does not yet know the full extent of the Receiver's mismanagement, malfeasance, and waste.

117.    However, based on the limited information presently available to Plaintiff, it is likely that the Bank's finances have been grossly mismanaged by Driven.

**J.      Driven's Failure to Protect Plaintiff's Artwork**

118.    As Receiver, Driven currently manages the Bank's Artwork: a collection of approximately 100 original paintings, photographs, and sculptures by renowned artists that took over a decade to curate.

119.    Prior to the receivership, Plaintiff's representatives hand-picked each piece to create a collection that told a meaningful narrative.  The collection is intended to support Latin American artists through acquisition of important historical and cultural pieces.

120. Before the Bank's liquidation, the Artwork could be viewed by members of the public who came into the Bank's main office. Plaintiff's representatives also frequently lent certain pieces to museums and public exhibitions.

121. The Artwork was last appraised in 2019 by Muriel Quancard. Upon information and belief, Driven has not performed subsequent appraisals.

122. Based on the 2019 valuation, Plaintiff estimates that the Artwork is worth roughly $22.5 million. This valuation does not take into consideration recent events that have undoubtedly increased the Artwork's value, such as the passing of a famous artist whose work constitutes a substantial portion of the collection.

123. The Artwork requires a meticulously controlled environment with precise temperature and humidity levels. Fluctuations in temperature, for example, can cause certain materials to expand or contract, altering the appearance of a piece. High humidity can also damage the Artwork by causing mold and mildew to accumulate. Climate fluctuations can also trigger chemical reactions between the materials used for the art, causing changes in a piece's color and overall aesthetics, ultimately preventing the beholder from experiencing and enjoying each piece as the artist intended.

124. All of these concerns apply to the Artwork. For instance, certain pieces contain platinum leaf paint, which may tarnish or corrode when exposed to unstable conditions. Other pieces contain metal and nylon, which expand and contract under certain temperatures.

125. Plaintiff has attempted to determine the current state of the Artwork and whether it is properly being preserved.

126. Driven has not sufficiently responded to these requests.

127.    Upon information and belief, the Artwork is currently stashed in crates in a vacant office, under conditions that are not meticulously controlled with precise temperature and humidity levels and therefore may be inadequate for its proper preservation.

128.    Driven's failure to properly preserve and the protect the Artwork is a breach of its fiduciary duty to Plaintiff.

Driven's failure to properly preserve and protect the Artwork constitutes professional negligence.

### K.    Driven's Improper Attempts to Sell the Artwork

129.    Pursuant to the terms of the Liquidation Plan, the Artwork may be sold if—and only if—funds are necessary to finalize the liquidation. Otherwise, the Bank's remaining assets should be distributed to Plaintiff.

130.    The January 2, 2024 flow-of-funds report (**"Flow of Funds"**) provided by Driven shows the Bank has two remaining creditors, which must be paid to finalize the liquidation: (i) FinCEN, which clearly would not be a creditor without Driven's decision to enter into a settlement agreement; and (ii) LW Casa de Valores.

131.    In the Flow of Funds, Driven represented to Plaintiff that as of December 29, 2023, the Bank's accounts at Facebank International Corporation and Apex—both of which Driven can access—held sufficient funds to pay these outstanding debts. Therefore, the Liquidation Plan can be effectuated without sale of the Artwork.

132.    Further, under the terms of the Receivership Order, Driven is required to ensure the avoidance of "any irreparable damage from being caused to the interests of [the Bank] . . . ." and "direct its efforts and activities to (i) *maximize the value to be obtained for the sale or disposal of those assets*; [and] (ii) *minimize the amount of loss realized* in the resolution of the matters under its purview . . . ." Ex. A at 1, 8 (emphases added).

25

133.    Despite Driven's restrictions on selling the Artwork and its duties to Plaintiff, recently, as detailed more fully in the Motion for Temporary Restraining Order and Preliminary Injunction, art collectors and dealers have contacted Plaintiff's representatives to inquire about purchasing the Artwork.

134.    The fact that Driven appears to be shopping around the Artwork shows that there is an imminent risk of transfer before the underlying claim is resolved. *See* Pl.'s Memorandum in Support of Temporary Restraining Order and Preliminary Injunction (ECF No. __) at 6–7.

135.    Plaintiff's counsel has tried to communicate with Driven's counsel on multiple occasions to ensure that the Artwork is being properly maintained and that the pieces would not be sold.

136.    In response, Driven did not guarantee that the Artwork would not be sold, and in fact offered to sell the Artwork back to Plaintiff.

137.    Driven's counsel additionally indicated there was a separate firm—which did not appear in the Eastern District of North Carolina litigation—that is handling certain issues, presumably including those regarding the Artwork.

138.    While the Artwork is in the Bank's possession under Driven's purview as the Bank's receiver, it does not belong to Driven.  Driven's current actions not only threaten Plaintiff's property interest in the Artwork but are also unnecessary and should be prohibited.

139.    Driven's attempts to sell the Artwork are further breaches of its fiduciary duty to Plaintiff.

140.    Driven's attempts to sell the Artwork constitute professional negligence.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

141.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

142.    Plaintiff was the Bank's sole shareholder at all relevant times related to the actions alleged herein.

143.    Plaintiff brings this action derivatively on behalf of and for the benefit of the Bank to redress injuries suffered by the Bank as a direct and proximate result of the breaches of fiduciary duty and other legal violations alleged herein.

144.    As sole shareholder, Plaintiff will adequately and fairly represent the interests of the Bank in enforcing and prosecuting its rights.

This action is not a collusive one to confer jurisdiction that the court would otherwise lack.

145.    The wrongful acts complained of herein subject, and will persist in subjecting, the Bank to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

146.    Apart from the litigation previously filed, Plaintiff has not made, until now, a formal demand on the Receiver—which is now in full control of the Bank (not the Board of Directors). The Receiver's control includes the decision to file or not file any "claim, lawsuit, or procedure on behalf of [the Bank]." Thus, it is futile to seek the Receiver to pursue the claims set forth herein and such a pre-suit demand is therefore excused as a matter of law.

147.    Demands are excused as a matter of law where—as here—there exists reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment such that they are entitled to the protection of the business judgment rule. Defendant's actions were not the product of "independent" business judgment because, as alleged above, Defendant acted in bad faith and in breach of its fiduciary duties to the Bank and Plaintiff, its shareholder.

27

148.     Thus, a demand on Defendant would be futile because it is Defendant itself that faces substantial risk of liability for acting in bad faith by breaching its fiduciary duty to Plaintiff and by negligently exposing the Bank to legal risk and other liabilities.

149.     Accordingly, the demand requirement is excused as a matter of law.

## COUNT ONE

### Breach of Fiduciary Duty (Derivative)

150.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

151.     Driven owes Plaintiff the fiduciary duties of care, loyalty, and good faith, which require Driven to act in the best interests of Plaintiff, put the interests of Plaintiff before its own, discharge its actions in good faith, and exercise reasonable and prudent supervision over Plaintiff's management, practices, controls, and financial affairs.

152.     Driven breached its fiduciary duties to Plaintiff by willfully, recklessly, and intentionally failing to perform its fiduciary duties.

153.     Driven breached its fiduciary duty of care to Plaintiff by entering the Consent Order with FinCEN in bad faith and without conducting adequate due diligence.

154.     Driven was presented with information regarding the Bank's AML compliance, but intentionally ignored those facts by entering the Consent Order, which not only omits these facts but also makes false admissions antagonistic to Plaintiff's interests.

155.     Driven had a fiduciary duty to correct these omissions and false admissions prior to entering the Consent Order.

156.     Driven further breached its fiduciary duty of care to Plaintiff by unnecessarily expending funds in entering the Consent Order, which imposes an unjust civil money penalty upon Plaintiff that is disproportionate to the conduct at issue.

157.    Driven further breached, and continues to breach, its duty of care to Plaintiff by failing to properly preserve the Artwork.

158.    Driven further breached its duty of care to Plaintiff by attempting to sell the Artwork.

159.    Driven breached its fiduciary duties of loyalty and good faith by placing its interests above Plaintiff's in entering the Consent Order.  Instead of heeding Plaintiff's counsel and correcting the Consent Order's omissions and false admissions, Driven entered the Consent Order in bad faith and thus placed its interests above Plaintiff's.

160.    As a direct and proximate result of Driven's breaches of its fiduciary duties of care, loyalty, and good faith, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

161.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT TWO

### Professional Negligence (Derivative)

162.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

163.    As Receiver, Driven has a duty to use such skill, prudence, and diligence as other members of the profession.  By virtue of this, Driven is required to exercise reasonable control and supervision over the Bank's agents, business, and operations; use sound business judgment in administering Plaintiff's financial operations; and accurately report to Plaintiff its financial affairs.

164.    Driven breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order in bad faith and without conducting adequate due diligence.  Driven was presented with information about the Bank's AML/BSA compliance and background about key transactions, but intentionally ignored those facts by agreeing to enter the Consent Order, which omits these facts and makes false admissions

29

antagonistic to Plaintiff's interests. Competent members of the receivership profession would have heeded Plaintiff's counsel and corrected these omissions and false admissions prior to entering the Consent Order.

165.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order without obtaining Plaintiff's consent and failing to share any drafts of the Consent Order with Plaintiff.

166.    Driven further breached, and continues to breach, its duty to use such skill, prudence, and diligence as other members of the profession by failing to properly preserve the Artwork.

167.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by attempting to sell the Artwork.

168.    As a direct and proximate result of Driven's breach of its duty to use such skill, prudence, and diligence as other members of the profession, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

169.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT THREE

### Breach of Fiduciary Duty (Direct)

170.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

171.    Driven owes Plaintiff the fiduciary duties of care, loyalty, and good faith, which require Driven to act in the best interests of Plaintiff, put the interests of Plaintiff before its own, discharge its actions in good faith, and exercise reasonable and prudent supervision over Plaintiff's management, practices, controls, and financial affairs.

172.    Driven breached its fiduciary duties to Plaintiff by willfully, recklessly, and intentionally failing to perform its fiduciary duties.

173.    Driven breached its fiduciary duty of care to Plaintiff by entering the Consent Order with FinCEN in bad faith and without conducting adequate due diligence.

174.    Driven was presented with information regarding the Bank's AML compliance and specific transactions, but intentionally ignored those facts by entering the Consent Order, which not only omits these facts but also makes false admissions antagonistic to Plaintiff's interests.

175.    Driven had a fiduciary duty to correct these omissions and false admissions prior to entering the Consent Order.

176.    Driven further breached its fiduciary duty of care to Plaintiff by unnecessarily expending funds in entering the Consent Order, which imposes an unjust civil money penalty upon Plaintiff that is disproportionate to the conduct at issue.

177.    Driven further breached, and continues to breach, its duty of care to Plaintiff by failing to properly preserve the Artwork.

178.    Driven further breached its duty of care to Plaintiff by attempting to sell the Artwork.

179.    Driven breached its fiduciary duties of loyalty and good faith by placing its interests above Plaintiff's in entering the Consent Order.  Instead of heeding Plaintiff's counsel and correcting the Consent Order's omissions and false admissions, Driven entered the Consent Order in bad faith and thus placed its interests above Plaintiff's.

180.    As a direct and proximate result of Driven's breaches of its fiduciary duties of care, loyalty, and good faith, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

181.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT FOUR

### Professional Negligence (Direct)

182.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

183.    As Receiver, Driven has a duty to use such skill, prudence, and diligence as other members of the profession.  By virtue of this, Driven is required to exercise reasonable control and supervision over the Bank's agents, business, and operations; use sound business judgment in administering the Bank's financial operations; and accurately report to Plaintiff, as the Bank's sole shareholder, its financial affairs.

184.    Driven breached its duty to Plaintiff to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order in bad faith and without conducting adequate due diligence.  Driven was presented with information about the Bank's AML/BSA compliance and background about key transactions, but intentionally ignored those facts by agreeing to enter the Consent Order, which omits these facts and makes false admissions antagonistic to Plaintiff's interests.  Competent members of the receivership profession would have heeded Plaintiff's counsel and corrected these omissions and false admissions prior to entering the Consent Order.

185.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order without obtaining Plaintiff's consent and failing to share any drafts of the Consent Order with Plaintiff.

186.    Driven further breached, and continues to breach, its duty to use such skill, prudence, and diligence as other members of the profession by failing to properly preserve the Artwork.

187.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by attempting to sell the Artwork.

188.    As a direct and proximate result of Driven's breach of its duty to use such skill, prudence, and diligence as other members of the profession, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

189.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to enter an order and judgment for Plaintiff and against Defendant granting the following relief:

(a)    Enjoining Driven, and anyone acting on its behalf, from further violating its fiduciary duty to the Bank;

(b)    Requiring Driven to provide Plaintiff the books and records that have previously been requested in connection with the issues alleged in this Complaint;

(c)    Allowing Plaintiff unfettered access to books and records of the Bank on a going-forward basis;

(d)    Awarding money damages for Driven's violation of fiduciary duty and professional negligence in an amount to be determined at trial exceeding $75,000;

(e)    Enjoining Driven from selling, transferring, damaging, or otherwise disposing of the Artwork;

(f)    Mandating that Driven specify how it is caring for the Artwork while in its possession;

(g)    Replacing Driven as receiver for the Bank with an independent and neutral third party;

(h)    Awarding Plaintiff its costs and expenses incurred in this litigation, including attorneys' fees, expert fees, and costs; and

(i)     Granting Plaintiff such other and further relief as the Court deems just and

proper.

Dated: January 23, 2024          Respectfully submitted,

*/s/ Alberto G. Estrella*

**ESTRELLA, LLC**

Alberto G. Estrella
USDC-PR Bar No. 209804
PO Box 9023596
San Juan, PR 00902-3596
Tel: (787) 977-5050
Fax: (787) 977-5090
agestrella@estrellallc.com

Stephanie M. Vilella
USDC-PR Bar No. 308603
PO Box 9023596
San Juan, PR 00902-3596
Tel: (787) 977-5050
Fax: (787) 977-5090
svilella@estrellallc.com

**WINSTON & STRAWN LLP**

Abbe Lowell
(pro hac vice admission forthcoming)
DC Bar No. 358651
1901 L Street, NW
Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
abbelowellpublicoutreach@winston.com

Richard Weber
(pro hac vice admission forthcoming)
NY Bar No. 2465094
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-1718

Fax: (212) 294-4700
rweber@winston.com

Elizabeth Ireland
(pro hac vice admission forthcoming)
NC Bar No. 47059
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
eireland@winston.com


*Attorneys for Plaintiff Bancrédito Holding Corporation*

35

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Luis Augusto Zapata, of legal age, married, resident of Miami, Florida, and President Chief Executive Offer of Bancrédito Holding Corporation, do hereby attest that I have read the above information and examined the Verified Complaint, and that the above is true to the best of my knowledge. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Miami, Florida on January 23, 2024.

Luis Augusto Zapata

36