## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| BANCRÉDITO HOLDING CORPORATION, on its own behalf and derivatively for the benefit of and on behalf of Nominal Defendant BANCRÉDITO INTERNATIONAL BANK & TRUST CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>DRIVEN ADMINISTRATIVE SERVICES LLC,<br><br>Defendant,<br><br>and<br><br>BANCRÉDITO INTERNATIONAL BANK & TRUST CORPORATION,<br><br>Nominal Defendant. | Case No.: 3:24-cv-01039-CVR<br><br>**FIRST AMENDED VERIFIED DIRECT AND DERIVATIVE SHAREHOLDER COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Bancrédito Holding Corporation ("**Plaintiff**" or "**BHC**"), sole shareholder of nominal defendant Bancrédito International Bank & Trust Corporation ("**Bank**" or "**Bancrédito**"), brings the following First Amended Verified Direct and Derivative Shareholder Complaint individually and derivatively for the benefit, on behalf and in the right of the Bank against Defendant Driven Administrative Services LLC ("**Defendant**" or "**Driven**"). Plaintiff, upon direct knowledge with respect to itself and its actions and otherwise on information and belief, alleges as follows:

### INTRODUCTION

Defendant was appointed as receiver to the Bank by its regulator, the Office of the Commissioner of Financial Institutions of Puerto Rico ("**OCIF**"). The conditions of its appointment, set out in the Complaint and Order of Interim and Permanent Appointment of

Receiver and Revocation of License (*Querella y Orden de Nombramiento Provisional y Permanente de Síndico y Revocación de Licencia*) ("**Receivership Order**"), attached as **Exhibit A**, which is a certified translation of the original filing in Spanish, expressly provide that Defendant occupies a position analogous to that of the Bank's management and board of directors prior to the receivership and, concomitantly, owes fiduciary duties to the Bank and its sole shareholder, Plaintiff.  Upon its appointment as receiver, Driven also became bound by the obligations of the Puerto Rico General Corporations Act of 2009 ("**PRGCA**"), which imposes fiduciary duties, among other obligations, on the directors and officers of corporations such as the Bank.

In direct contravention of those duties, Defendant: (i) refused to communicate with Plaintiff, (ii) provided inaccurate information to Plaintiff, (iii) refused to give Plaintiff access to critical information about the Bank's financial situation, (iv) excluded Plaintiff from its negotiations with FinCEN, (v) disposed of company assets without notifying Plaintiff-shareholder; and (vi) made admissions that are not only directly adverse to the Bank's and Plaintiff's interests but are also factually incorrect and unsupported by the evidence that should have been considered had Defendant simply accepted the information Plaintiff sought to provide.  As a direct consequence of Defendant's actions, the Bank and Plaintiff are faced with harm, including, but not limited to, a $14.7 million civil money penalty imposed by FinCEN, the conversion of approximately $1.1 million in assets, and immeasurable reputational harm.

To estop Driven's harmful conduct, Plaintiff filed a lawsuit in the Eastern District of North Carolina on October 12, 2023.  While it was pending, Plaintiff learned that Driven was attempting to sell the Bank's rare, hand-selected and extremely valuable art collection (the "**Artwork**"), which forms part of the Bank's corporate assets.  The Plan of Liquidation and Dissolution of Bancrédito International Bank & Trust Corporation ("**Liquidation Plan**"), further described below, states that

all of the Bank's assets remaining after the liquidation are to be returned to Plaintiff as the sole Shareholder of the Bank.

Given the information about a potential sale, on January 4, 2024, Plaintiff filed a Motion for Temporary Restraining Order ("**TRO**") and Preliminary Injunction in the Eastern District of North Carolina to: (i) enjoin Driven from selling, transferring, damaging, or otherwise disposing of the Artwork; and (ii) mandate that Driven specify how it is appropriately caring for the Artwork.

On January 9, 2024, the action in the Eastern District of North Carolina was dismissed without prejudice on personal jurisdiction grounds.[1]  Two weeks later, on January 23, 2024, Plaintiff filed a Verified Direct and Derivative Shareholder Complaint (Dkt. 1) (the "**Complaint**") in this forum along with a Motion for TRO and Preliminary Injunction to prevent Driven from causing any further harm to the Bank's corporate assets (Dkts. 2 & 3).  As directed by the Court in its January 31, 2024 Order (Dkt. 22), Plaintiff and Defendant engaged in good-faith negotiations regarding the issues subject to the Motion for TRO and Preliminary Injunction and, on February 7, 2024, reached an agreement related to the Artwork ("**February 7 Agreement**") (Dkt. 23).  In light of the agreement, Plaintiff and Defendant submitted a joint motion to vacate the Preliminary Injunction Hearing (Dkt. 23), which the Court granted (Dkt. 24).

As part of the February 7 Agreement, Defendant provided Plaintiff with a revised inventory of the Artwork.  The inventory revealed that Defendant had already sold two valuable pieces from the collection—without providing notice, or obtaining approval from, Plaintiff—even though Driven had sufficient funds to pay its creditors, which made such sales unnecessary and

---

[1] Without reaching a decision on the TRO, the Court stated: "Given the immediacy of the harm alleged by Plaintiff in the motion for restraining order, the court's analysis of Defendant's motion to dismiss is limited to the issue of personal jurisdiction, so that Plaintiff may, if it so chooses, timely seek relief in an alternative forum.  *See* Fed. R. Civ. P. 1." *Bancrédito Holding Corp. v. Driven Admin. Servs., et al.*, Case No. 5:23-cv-00575-M-BM, ECF No. 23 at 2 (E.D.N.C. Jan. 8, 2024).

unwarranted.  On March 7, 2024, Plaintiff's representatives met with Defendant's representatives to visually inspect what remained of the Artwork.  Plaintiff's representatives were not permitted to take photos.  The inspection confirmed that Defendant had disposed of several valuable pieces and revealed that nearly all the sculpture installations by Jesus Rafael Soto had been dismantled ("**Soto Pieces**").  Defendant later provided the sale prices of the items that were sold but refused to provide complete information regarding the identity of the purchaser(s).

For the reasons set forth below, Plaintiff files this First Amended Verified Direct and Derivative Shareholder Complaint to hold Driven responsible for its professional negligence, fiduciary duty breaches, and conversion.

## **PARTIES**

1.      Plaintiff BANCRÉDITO HOLDING CORPORATION is a New York corporation that owns all the capital stock of the Bank.  Plaintiff's principal place of business is Florida.

2.      Defendant DRIVEN ADMINISTRATIVE SERVICES LLC is a limited liability company formed under the laws of Puerto Rico that is a financial advisory firm.  Defendant's sole member is another Puerto Rico limited liability company—Driven P.S.C.—that, in turn, has five members, all of whom are residents of Puerto Rico.  Driven P.S.C. is a professional accounting firm that has served as an outside auditor of the Bank.  Driven's principal place of business is Puerto Rico.

3.      Nominal Defendant BANCRÉDITO INTERNATIONAL BANK & TRUST CORPORATION is a Puerto Rico corporation that at relevant points in time prior to entering receivership held an international banking entity ("**IBE**") license to provide financial services to persons who are not residents of Puerto Rico, including personal, private, institutional, and corporate banks in the United States and abroad.

4

4.      Plaintiff was the Bank's sole shareholder at all times relevant to the allegations herein and remains the Bank's sole shareholder.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  The parties are citizens of different states, and the matter in controversy exceeds $75,000.

6.      This Court has personal jurisdiction over Defendant because it is a Puerto Rico limited liability company, whose sole member is another Puerto Rico limited liability company that, in turn, has five members, all of whom are residents of Puerto Rico.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant and the Bank reside in Puerto Rico.

8.      There is no need for Plaintiff to first bring this action before OCIF and exhaust its administrative remedies, because remedies are available under the PRGCA, providing this Court with jurisdiction and/or exclusive jurisdiction.

9.      Additionally, this Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

### A.      The Bank's Inception, Development of AML Compliance Efforts, and Regulator Relationship

10.      The Bank was incorporated in 2008 pursuant to the PRGCA.  Plaintiff, a New York corporation, has been the Bank's sole shareholder at all times relevant to the allegations herein.

11.      As part of its normal operations, the Bank established compliance programs, including anti-money laundering ("**AML**") policies, procedures, and internal controls.  Standard AML procedures—which the Bank implemented—involve establishing protocols for review of certain transactions for suspicious activity and filing reports of suspicious activity, known as

suspicious activity reports ("**SARs**"), with the U.S. Department of the Treasury pursuant to 31 C.F.R. § 1020.320.

12.    The Bank was granted a license as an IBE under the Puerto Rico International Banking Center Regulatory Act [Act No. 52 of August 11, 1985, as amended] (the "**IBE Act**"). As such, OCIF regulates, supervises, and examines the Bank and other similarly situated financial institutions that are organized under the laws of the Commonwealth of Puerto Rico.

13.    For example, during regular intervals while the Bank was authorized to conduct a depository institution business pursuant to its license as an IBE, OCIF examined the Bank's credit and other financial services functions and its compliance with the applicable provisions of the Bank Secrecy Act ("**BSA**"), which is the principal AML law of the United States.  During such examinations, the Bank promptly provided relevant information in response to OCIF's requests.

14.    Additionally, the Bank and OCIF entered into a Memorandum of Understanding on December 21, 2021 (the "**2021 MOU**"), in which the Bank agreed to certain AML program improvements, including organizing a Special BSA Directors Committee ("**Special Committee**") to oversee the Bank's compliance programs; to conduct an independent look-back review for a five-year period of substantially all of its customers' transactions for AML compliance purposes (the "**Look-Back**"); and to pay an administrative money penalty for a total amount of $97,000— in stark contrast to the $14.7 million penalty imposed by FinCEN in response to what is essentially the same conduct.

15.    The Look-Back entailed a thorough review of the Bank's past records and procedures within the parameters discussed in paragraph 22 below.  The Bank retained a highly credentialed third-party consultant ("**Consultant**") to conduct the Look-Back.  The Consultant found that the Bank's customer risk-rating methodology properly identified higher-risk customers.

Moreover, the data showed that Bancrédito filed multiple SARs for customers identified as high-risk.

      **B.**    **The Bank's Substantial BSA/AML Compliance**

      16.     The Bank engaged an independent and highly credentialed independent audit firm ("**Firm One**") to conduct a thorough review of its BSA/AML and sanctions-compliance programs and to provide a report and recommendations. Firm One conducted a review for the years 2019 and 2020, then issued detailed audit reports regarding the BSA/AML compliance program of the Bank.

      17.     The 2020 report of Firm One gave the Bank's BSA/AML compliance program its second-highest rating: "fair," meaning that "no significant errors or material violations of law or BSA/AML" were observed.

      18.     Noting improvement, a year later, in its 2021 report, Firm One upgraded the Bank's rating to "satisfactory," the highest rating available.

      19.     Concurrent with its engagement of Firm One, the Bank engaged another independent and highly credentialed independent audit firm ("**Firm Two**") to complete BSA/AML compliance audit reviews for the calendar years 2020 and 2021, and to validate the prior review conducted by Firm One in 2020 and confirm that the Bank had earned a "satisfactory" rating.

      20.     Firm Two ultimately gave the Bank the highest-available rating of "satisfactory" for both years.

      21.     In 2022, the Bank additionally engaged the Consultant—approved by OCIF—to conduct the Look-Back.

      22.     The Consultant's Look-Back parameters called for the review of "(a) all customer (individual and entities) accounts and transactions in excess of $2,500; and (b) all accounts and

transactions from foreign correspondent accounts in excess of $2,500" from January 1, 2016 to December 31, 2020.

23.    On April 8, 2022, the Bank provided OCIF with a copy of the Consultant's proposed Look-Back plan, which set out the scope, parameters, number of accounts, and transactions expected to be reviewed.  On May 10, 2022, OCIF approved the Look-Back plan.

24.    As is detailed further below, while the Bank was in sound financial condition, in August 2022, Plaintiff, the Bank, and OCIF entered into a voluntary Liquidation Plan as part of a settlement related to the Bank's compliance with the MOU and in connection with the Bank's desire to withdraw from the jurisdiction to focus its capital resources on other business endeavors. The Liquidation Plan terminated, substituted, and superseded the MOU, except for the provisions of the Look-Back.  The Look-Back was completed on or around November 2, 2022.

25.    The Consultant's review concluded that the Bank's BSA/AML customer risk-rating methodology properly identified higher-risk customers.

26.    The review identified certain transactions that raised indicia of suspicion but did not include a recommendation that the Bank file SARs on those transactions.

C.    **The Bank's Liquidation Plan and Efforts to Effectuate It**

27.    Upon information and belief, the financial condition of the Bank at all times prior to the appointment of Driven as receiver was sound, its asset quality was good, and its capital position was strong.

28.    In or around April 2022, certain members of the Bank's board of directors ("**Board of Directors**"), who were serving on the Special Committee mandated by the 2021 MOU, unexpectedly resigned, hindering the Bank's ability to comply with that obligation of the 2021 MOU.

29.    Upon information and belief, the Bank promptly contacted OCIF, seeking its guidance and requesting a meeting to discuss how to fill the Special Committee's vacancies by OCIF's imposed deadline. Although a meeting was scheduled to discuss the Special Committee's vacancies on or around May 12, 2022, OCIF cancelled this meeting on May 12 without providing an explanation.

30.    On or around May 16, 2022, OCIF filed legal proceedings against the Bank, alleging breach of obligations set forth in the 2021 MOU solely related to the establishment of the Special Committee.

31.    To settle that matter, in August 2022, Plaintiff, the Bank, and OCIF entered into the voluntary Liquidation Plan for the Bank. The negotiation of the Liquidation Plan was made possible by Plaintiff, whose counsel engaged with OCIF in discussions related to the voluntary liquidation of the Bank because the Plaintiff had previously decided to leave the jurisdiction. Through the course of those negotiations, OCIF provided comments to drafts of the Liquidation Plan that was being negotiated with Plaintiff.

32.    Prior to entering into the Liquidation Plan with the OCIF, Plaintiff informed OCIF of its desire to withdraw from the jurisdiction to focus its capital resources on other business endeavors and therefore expressed its willingness to voluntarily liquidate the Bank.

33.    The Liquidation Plan appointed Driven as administrator for the Bank during the liquidation process. As administrator, Driven was charged with paying and discharging "all liabilities and obligations" of the Bank.

34.    The Liquidation Plan allows for the sale of assets, but only if funds are necessary to finalize the liquidation. In other words, if funds are available to pay all outstanding debts, then the assets should not be sold, and they can be returned to the Plaintiff.

35.    After the appointment of Driven, the Bank's Board of Directors and Officers continued in their roles.  As service provider to the Bank, Driven answered to the Bank and its management.

36.    On September 20, 2022, OCIF sent a letter to Plaintiff's counsel asking that the Bank and Plaintiff assist in expediting the liquidation process.

37.    In compliance with the request, Plaintiff and the Bank endeavored to provide material assistance in expediting and completing the Liquidation Plan.

38.    Specifically, OCIF requested assistance executing the part of the Liquidation Plan that required Driven to pay certain depositors the money they held in their Bancrédito accounts within the first thirty (30) days of the Liquidation Plan's effect.

39.    Accordingly, Plaintiff contacted Berkeley Bank & Trust Limited ("**Berkeley**") in the United Kingdom.  Berkeley had an account with the Bank that contained a large sum of money and was entitled to the deposits in the Bank's account within the first thirty (30) days of the Liquidation Plan's execution.

40.    A significant portion of the money in Berkeley's Bancrédito account resulted from the maturity of certain U.S. Treasury Bills belonging to Bancrédito.

41.    Plaintiff therefore requested that Berkeley transfer funds to the Bank's account at a different bank in Puerto Rico.  Berkeley followed Plaintiff's instructions and executed the required transfer authorization, while also requesting that the Bank return to it the remaining balance in the account (about $1.3 million) as required under the Liquidation Plan.  The Bank, through Defendant, agreed to repay Berkeley.

42.    Despite Berkeley's performance under the agreement, and in direct violation of the Liquidation Plan, Driven failed to repay Berkeley.

43.     Upon information and belief, Driven failed to inform Plaintiff of this default. Plaintiff only learned of the default after OCIF placed a hold on the Bank's transfers that would last until all of the Bank's funds were transferred to two separate banks—a condition that was not part of the Liquidation Plan.

44.     Driven's actions not only caused the Bank to breach its obligations to Berkeley under the Liquidation Plan—which breach led to Berkeley filing suit against the Bank—but they also stalled the liquidation process because Driven was no longer able to pay the depositors, as explained in Paragraphs 36 and 37.

45.     Driven's breach of the Liquidation Plan further exposed the Bank to civil liability because (i) Berkeley subsequently filed suit in the U.S. District Court of Puerto Rico, seeking declaratory relief and payment of $1.3 million; and (ii) Driven's failure to timely transfer the $26 million that Berkeley held for Bancrédito set Bancrédito behind in its ability to repay other depositors.

**D.     OCIF's Appointment of Driven as Receiver**

46.     On or about January 11, 2023, OCIF issued the Receivership Order (i) revoking the Bank's IBE license and (ii) placing the Bank into receivership, designating Driven as its receiver ("**Receiver**").

47.     As Receiver, Driven assumed—with full knowledge—control of the Bank's assets and liabilities and assumed the role of the Bank's Board of Directors and Officers.

48.     In some circumstances, the appointment of a receiver is appropriate because a company has limited resources and cannot adequately maximize its own financial resources.

49.     However, in this case, the Bank had about $30 million at its disposal in accounts under the Bank's name, which was three times the amount necessary to liquidate the Bank's debts. Despite this, OCIF issued its Receivership Order, which alleged that BHC was impeding the Board

of Directors of BHC from moving forward with the Liquidation Plan. Pursuant to the terms of the Receivership Order, Driven's primary directive was to "complete … the Liquidation Plan." *See* Ex. A at 6.

50. Driven was provided "flexibility in its mandate, to be able to handle situations not expressly detailed in the Liquidation Plan." *Id.*

51. For example, Driven was given the "power to … vindicate [the Bank's] rights over its property and assets" and "appoint agents to carry out these mandates and take any other action that [the Bank] would have been able to do and that is necessary and appropriate." *Id.*

52. Critically, the Receivership Order expressly stated that:

> [Defendant] will be in a position similar to the one that the management and directors of [the Bank] held prior to the receivership. Therefore, the management and directors of [the Bank] are ordered to place the Receiver in control of the [B]ank so that the Receiver, advised by any professionals that it deems necessary, may complete the remaining processes to finalize the liquidation of [the Bank].

*Id.* at 6–7.

53. More specifically, the Receivership Order made clear that "[a]s part of said mandate, the Receiver will have a fiduciary duty both to [the Bank's] creditors as well as to [the Bank's] Shareholder"—that is, Plaintiff. *Id.* at 7.

**E.    Driven's Early Disregard for Its Duties of Disclosure and Due Care**

54. Even though most of the liquidation had been completed prior to Driven's appointment, the Receiver was tasked with finalizing the liquidation.

55. As part of its work, the Receiver had the discretion to select an escrow agent and open an escrow account to hold and secure the Bank's funds.

56.     That discretion was subject to specifically negotiated terms and conditions, pursuant to a Settlement Agreement entered into in March 2023 among Plaintiff, the Bank, and OCIF (the "**Settlement Agreement**") to resolve certain disputed aspects of the Receivership Order.

57.     The Settlement Agreement stated that the Receiver must retain an escrow agent that qualifies as "a reputable agency or financial institution or [sic] such as the Royal Bank of Canada or similar."  This condition was critical to Plaintiff because it wanted to ensure the Bank's cash was at a world-renowned depository institution.

58.     Instead of complying with this specific condition to retain as escrow agent a depository institution similar to Royal Bank of Canada ("**RBC**"), Driven retained a trust company called Apex Corporate Trustees (UK) Limited ("**Apex**") to serve as the escrow agent.

59.     By way of illustration, RBC has over 97,000 employees who serve 17 million clients in 29 countries.  RBC's revenue ranges in the billions, making it the eleventh-largest depository institution in the world.  In contrast to RBC, as of December 31, 2022, Apex had 52 employees and less than $3 million in revenue.  Thus, under any fair reading of the explicit condition regarding the placement of the Bank's funds, Apex could not be considered "similar" to RBC.

60.     By engaging Apex as escrow agent, Driven breached its fiduciary duty of care and good faith to the Bank and its Shareholder.

61.     Moreover, the Receiver did not provide sufficient detail about the appointment of Apex in its March 29, 2023 communication, which notified Plaintiff that the Bank's funds would be transferred to an escrow account maintained at Lloyds Bank plc in London, England.  In said notice, the Receiver failed to disclose who was the escrow agent and whose name the account was

under, thereby misleading Plaintiff to believe that Lloyds Bank—a better-regarded financial institution than Apex—was the escrow agent.

62.     When Plaintiff learned that Apex was being considered as the escrow agent, Plaintiff raised concerns about its rating.  Plaintiff, through its counsel, previously indicated to OCIF and Driven its opposition to the appointment of Apex as escrow agent as this appointment was in breach of the express terms of the Settlement Agreement.  OCIF and Driven were aware of such opposition by Plaintiff prior to Apex's engagement as escrow agent by Driven.

63.     On April 24, 2023, Plaintiff's attorneys sent Driven's counsel an email noting the fiduciary duties that Driven owed to the Bank under the Receivership Order and requesting that Driven provide basic financial information.  The email indicated that "the Receiver must comply with such fiduciary duties owed to the sole shareholder, that at the very least require transparency with the sole shareholder."  The email also cited to the PRGCA, which provides Plaintiff, as the Bank's sole shareholder, the right to inspect the Bank's books and records.

64.     Driven's attorney never responded.

65.     On May 1, 2023, Plaintiff again contacted Driven's counsel, making a formal request under Article 7.10 of the PRGCA, as amended, 14 L.P.R.A. § 3650, for the Bank's audited financial statements for the preceding year and other relevant information that the Plaintiff has a right to pursuant to Article 7.10 of the PRGCA.

66.     On May 9, 2023, Driven's counsel declined to provide Plaintiff with the Bank's books and records.

67.     At that time, Driven's attorneys stated that they were requesting an extension from OCIF until May 31, 2023 to prepare the Bank's audited financial statements.

68.     Driven's attorneys clearly stated that they would provide a copy of said statements to Plaintiff once they were finalized.

69.     Plaintiff has repeatedly followed up requesting that information or to inspect the Bank's books and records.

70.     Driven has never provided the information that was requested, nor has Driven provided to Plaintiff the Bank's audited financial statements for the years ending 2022 and 2023, which documents were promised and which documents the Plaintiff has a right to obtain under the PRGCA.

71.     The Bank is required by law to file its audited financial statements with OCIF under Article 15 of the IBE Act, 7 L.P.R.A. § 232m.

    **F.**    **Driven's Refusal to Respond to Formal Record Requests**

72.     The Receivership Order expressly provides, as noted, that the Receiver shall be in a position analogous to that of the management and the Board of Directors prior to the receivership.

73.     The Receivership Order also provides that the Receiver "shall have a fiduciary duty to … the Shareholder of [the Bank]," which was—at all times relevant hereto—Plaintiff.

74.     But the Receiver's fiduciary duties to Plaintiff are not exclusive to the Receivership Order.  Article 4.03 of the PRGCA, 14 L.P.R.A § 3563, also imposes fiduciary duties on the directors, or governing bodies, of Puerto Rico corporations.  Because the Receiver is in full control of the Bank, its assets, and its documents, it is a governing body under the PRGCA.

75.     As the sole shareholder, Plaintiff has a right to the Bank's books and records. Because Driven was appointed to assume the role of the Bank's Board of Directors, Driven is required to fulfill requests for books and records.

76.     Despite those responsibilities and obligations, Driven has refused to comply with Plaintiff's repeated requests to inspect the Bank's books and records.

77.    For example, on May 1, 2023, Plaintiff requested from Driven different documents, including audited financial statements and monthly budgets ("May 1, 2023 Letter," attached as **Exhibit B**).  Plaintiff based its request on Article 7.10 of the PRGCA.

78.    These documents would have allowed Plaintiff to (i) determine the current value of the Bank; (ii) determine the costs and expenses of the liquidation and receivership; (iii) clarify discrepancies in information previously provided by the Bank; and (iv) evaluate any potential mismanagement or waste.

79.    Plaintiff made its request in writing and under oath.  Ex. B at 2.

80.    On May 9, 2023, Driven formally declined Plaintiff's request on the basis that Plaintiff allegedly did not have a right to the information under the Settlement Agreement or Receivership Order.  As for its obligation under Article 7.10 of the PRGCA, Driven stated that the request was denied because Plaintiff failed to show a proper purpose to request the documents without providing further explanation and despite the fact that the purpose outlined in the May 1, 2023 letter was lawful under Article 7.10.

81.    On June 2, 2023, Plaintiff reasserted its request for the Bank's books and records in a letter ("June 2, 2023 Letter," attached hereto as **Exhibit C**), noting that neither the Settlement Agreement nor Receivership Order overrode Plaintiff's statutory right under Article 7.10 to the Bank's books and records.

82.    The June 2, 2023 Letter restated the lawful purposes for which the books and records were being sought, including, but not limited to, "to investigate possible breaches of fiduciary duty, mismanagement, … corporate waste, [and] improper conduct"; "to evaluate the independence and disinterestedness of the Receiver";  and "to value [Plaintiff's] economic interest

in [the Bank]."  Ex. C at 2.  Like previous requests, the June 2, 2023 request was in writing and made under oath.  *Id.* at 3.

83.     On June 12, 2023, Driven again denied Plaintiff's request.

84.     To this day, Driven has failed to provide the requested documentation, including the basic audited financial statements that were promised and that are required under the IBE Act.

85.     After the commencement of the litigation in the Eastern District of North Carolina, on December 4, 2023, Plaintiff's counsel sent a letter ("**December 4 Letter**") via email to Driven's counsel requesting confirmation within seven (7) business days of receipt that Driven was preserving all Bank-related documentation originating from Driven or from the Bank itself.

86.     Driven's counsel who appeared in the Eastern District of North Carolina litigation did not respond within seven (7) business days of receipt and, to date, still has not directly responded to the December 4 Letter request related to the document preservation.

87.     Plaintiff did, however, receive a response letter from McConnell Valdés LLC ("**McV**"), who eventually appeared in this forum as Driven's counsel, dated December 21, 2023 ("**December 21 Response**").  McV's December 21 Response to Plaintiff's December 4 Letter referred Plaintiff back to the communications of prior years in which Driven refused Plaintiff's requests to inspect the Bank's books and records.

88.     By failing to provide information to the Plaintiff as its sole shareholder, Driven has violated Articles 4.03 and 7.10 of the PRGCA.

89.     Driven is intentionally withholding critical information that may allow Plaintiff to fully determine whether the Receiver has incurred additional corporate waste.

### G.     <u>FinCEN's Involvement and Driven's Refusal to Involve Plaintiff</u>

90.     On or around mid-November 2019, FinCEN commenced an investigation of the AML compliance program of the Bank.  Upon information and belief, the documents and evidence

that FinCEN relied on to support its investigation were largely based on and/or obtained from OCIF's examinations.

91.    Upon information and belief, the Bank retained McV to negotiate with FinCEN.

92.    After Driven was appointed Receiver, McV engaged in negotiations with FinCEN on behalf of the Bank and on behalf of Driven.

93.    Upon information and belief, the Bank's counsel, including McV, provided advice regarding the filing of SARs and other compliance-related issues.

94.    Upon information and belief, since at least early December 2022, FinCEN and Driven (first as administrator and then as Receiver)—through its counsel at McV—engaged in negotiations to address FinCEN's regulatory concerns.

95.    Under Article 4.07 of the PRGCA, "the directors or officers of any corporation," 14 L.P.R.A. § 3567, are directly prohibited from "knowingly caus[ing] the publication of or furnish[ing] any false written statement or report with respect to any important issue regarding the condition or business of the corporation…. [D]irectors or officers who shall have caused the publication or shall have furnished or approved such report or statement shall each be jointly liable for any loss or damage resulting therefrom."

96.    Given Plaintiff's status as the sole shareholder of the Bank, and concomitant knowledge regarding the issues and/or allegations in FinCEN's investigation, Plaintiff offered on several occasions to assist the Receiver during the course of its settlement negotiations.

97.    Around this time, the Bank's former counsel also had at least two calls with the Receiver to share its work product from separate 2017 and 2018 independent reviews of the Bank's BSA/AML program.  On the calls, the Bank's counsel actively tried to help the Receiver marshal evidence to explain the Bank's BSA/AML processes to FinCEN.  The reviews contained

recommendations that the Bank take steps to decrease its risk appetite, which the Bank immediately acted upon. The subsequent Look-Back reported, in relevant part, that the Bank, after taking these actions, engaged in materially less high-risk transaction activity, not more. In contrast, FinCEN's reported findings, which Plaintiff admitted, claimed that the Bank's AML program deteriorated over time, and the Bank subjected the United States to ever-increasing levels of risk, not less.

98.     The reviews, corroborated by the results of the Look-Back review, show that the Bank's BSA/AML procedures got better over time, not worse, and, for the same reasons, the Bank consequentially subjected the United States to less risk.

99.     Instead, Driven consistently and willfully failed to (a) include the Bank and Plaintiff in its discussions; (b) provide the Bank and Plaintiff with updates of its dealings with FinCEN; or (c) even bother to obtain the critical information Plaintiff possessed and sought to provide to Defendant that would have helped resolve FinCEN's concerns or, at a minimum, ensured that Defendant was operating from the correct set of facts in dealing with FinCEN on behalf of, and as fiduciary for, Plaintiff.

100.     Driven also intentionally ignored or otherwise rejected Plaintiff's repeated offers to participate in the negotiations with FinCEN.

101.     Had Plaintiff been permitted to participate—or at least been able to provide Driven and FinCEN with the necessary and crucial information Driven lacked—it would have ensured the best possible outcome for the Bank to resolve FinCEN's AML compliance investigation.

102.     In fact, Driven never provided Plaintiff with any written drafts of the Consent Order (as defined below), leaving Plaintiff (i) without information as to the form and substance of what

would become of the Consent Order, and (ii) unaware of the incomplete and—in many areas false—set of facts to which Driven would ultimately "admit" in the Consent Order.

103.    Had Driven engaged with Plaintiff in connection with the Consent Order negotiations, Plaintiff would have provided information that contradicted numerous assertions in the Consent Order—and Driven would not have ultimately agreed to the Consent Order's contentions.

104.    As detailed below, failing to engage with Plaintiff in this regard and entering into the Consent Order on an uninformed basis harmed both the Bank and Plaintiff and constituted not only a breach of Driven's fiduciary duties, but also a violation of Articles 4.03 and 4.07 of the PRGCA.

### H.    The FinCEN Consent Order

105.    On September 15, 2023, FinCEN issued its Consent Order Imposing Civil Money Penalty (the "**Consent Order**") against the Bank, imposing a $14.7 million civil money penalty.

106.    Driven consented to and approved the Consent Order without Plaintiff's consent.

107.    Plaintiff was unaware that the Consent Order would be issued that day, and Plaintiff had no idea it would include such a large fine.  Plaintiff also had no prior knowledge of the statements that would be contained in the Consent Order.

108.    Driven caused the Bank to agree to pay a $14.7 million civil penalty and admit to an erroneous, incorrect, false, misleading, and harmful set of facts implicating the Bank and certain other parties.

109.    Based on information and belief, FinCEN's Consent Order mirrored the allegations of OCIF's 2021 MOU, which was issued prior to Driven's involvement and imposed a civil money penalty of $97,000.

110.    Driven, through its counsel McV, could have corroborated the Bank's defenses and known facts that were ignored in the Consent Order.

111.    Agreeing to this excessive fine and admitting to this inaccurate set of facts without exercising even a modicum of due care—e.g., simply checking against the extensive information available to the Bank's sole shareholder to determine whether those facts were accurate—was an egregious breach of Defendant's fiduciary duties of care and loyalty.  It bordered on intentional neglect, and it severely and significantly damaged the Bank's reputation, exacerbated rather than improved its financial condition, and harmed both the Bank and Plaintiff in a significant manner.

### 1.    The Consent Order's Erroneous Information Regarding the BSA/AML Program

112.    FinCEN's Consent Order incorrectly contests the appropriateness of Bancrédito's AML program.  It states that FinCEN "identified tens of thousands of transactions by high-risk accountholders processed through Bancrédito's foreign correspondent accounts, representing hundreds of millions of dollars in transactions."  Yet, when presenting "[t]he following examples" as "illustrative of Bancrédito's failure to establish an adequate correspondent account due diligence program," the order lists only *one* foreign correspondent account: AllBank Corporation ("**AllBank**").

113.    On this point, the Consent Order recounts facts that suggest AllBank permitted three clients with potentially suspicious ties to conduct transactions through its institution.  FinCEN thus adequately described due diligence weaknesses in *AllBank's*—not *Bancrédito's*—compliance program.  Indeed, the Consent Order fails to state any facts regarding Bancrédito's due diligence on AllBank.  Driven, through its counsel, allowed this inaccuracy to be included in the Consent Order.

114.    This allegation is also contrary to the findings of the BSA/AML compliance reports issued by the independent audit firms referenced in Section B of this Complaint, which consistently rated Bancrédito's AML program as either "fair" or "satisfactory."  It is also inconsistent with the Look-Back, which reviewed nearly 135,000 transactions and found that the Bank did not fail to file any necessary currency transaction reports.

115.    In entering the Consent Order, the Receiver agreed to a narrative that Bancrédito's AML program deteriorated over time, which ignores the findings of the AML compliance reports issued by the independent audit firms.  Driven had knowledge through its counsel McV that this narrative was false, because McV represented the Bank in this respect while negotiating the MOU with OCIF.

116.    The FinCEN Consent Order also erroneously states that Bancrédito failed to file SARs on "over $100 million in suspicious transactions."  This statement might be based on a similar—but different—finding from the Look-Back.

117.    The Look-Back report found about $100 million in transactions—from customers for which the Bank had *already* filed SARs—that merited additional "escalation to the BSA Department."  That is, the report found that Bancrédito should have *internally* followed up on these transactions.  The report did not find that additional SAR filings were required for the transactions.

### 2.    The Consent Order's Erroneous Information Regarding SARs

118.    In the Consent Order, Driven agreed with FinCEN that there were "hundreds of millions of dollars in suspicious transactions on which … Bancrédito failed to file timely SARs."

To illustrate this point, the Consent Order provides the examples of three individuals it denotes as Customers A, B, and C.[2]

119.    Regarding Customer C, "a private investment company, created for the purpose of owning a luxury yacht, with an account at Bancrédito," the Consent Order states that "Executive A initiated a series of five transfers from [his private investment company ('**PIC**')] account to various payees totaling over $1.3 million … to make payments for the renovation of the yacht under the control of Customer C."

120.    It appears, from the Consent Order, that FinCEN concluded that the purchase and sale of the yacht did not have a lawful business purpose.  However, a basic review of the documents available to the Bank would have caused the Bank to conclude that the transaction had a lawful business purpose and, as such, was not suspicious.

121.    It appears FinCEN did not have sufficient information—which could have and should have been provided by Driven—to make a determination about the issues with Customer C.

122.    Instead, the facts associated with Customer C are as follows:

(a)    In 2016, Jose Luis Arana Muñoz de Cote, a professionally licensed yacht broker-dealer, informed Executive A about M/Y PURE ONE, a 46-meter Leopard (the "**PO Yacht**").  The PO Yacht was subject to sequester, custody, and control of the Italian Bankruptcy Court in Pisa, Italy.  Said court was in the process of having interested buyers submit offers to participate in a bid auction for the acquisition of the PO Yacht.

---

[2] Because the Receiver has consistently denied Plaintiff access to the Bank's records, Plaintiff responds only to the allegations of Customer C, but anticipates it could respond to other allegations if allowed to inspect the records (as is Plaintiff's right).

(b)     Executive A appointed Mr. de Cote as his nominee and fiduciary in the auction process and instructed Mr. de Cote to submit a bid for the PO Yacht on his behalf and to handle all matters and aspects relating thereto.  This arrangement was memorialized in a Memorandum of Understanding on June 14, 2016 ("**2016 MOU**").  Specifically, the 2016 MOU appointed Mr. de Cote as Executive A's nominee, trustee, fiduciary, and attorney-in-fact for the acquisition and management of the PO Yacht.  The 2016 MOU also granted Mr. de Cote the right and power to utilize Executive A's funds to purchase the PO Yacht if the bid was approved.

(c)     The formal auction closing took place on August 21, 2016 and is evidenced by a Buyer's Auction Closing Statement listing the following particulars:

- <u>Buyer</u>: Mr. de Cote, as trustee for Executive A
- <u>Seller</u>: Tribunale Ordinario de Pisa, Sezione Esecuzione Mobiliari
- <u>Vessel</u>: WY PURE ONE, Leopard 46m
- <u>Date of Auction Closing</u>: August 21, 2016
- <u>Signatories</u>: (i) Mr. de Cote, as Trustee; and (ii) Executive A, as Beneficiary.

(d)     Subsequent to the PO Yacht's acquisition, Mr. de Cote coordinated and managed payment on behalf of Executive A for the inspections and extensive repairs the vessel required.

(e)     Executive A and Mr. de Cote also entered into a Broker's Commission Agreement ("**BCA**"), which details that Mr. de Cote was to receive a commission for his efforts in assisting Executive A with the auction and repair process.  The BCA also ratifies the parties' 2016 MOU and vests title of the PO Yacht in the name of Pure One Marine Corporation ("**POMC**").

(f)     POMC was incorporated on October 20, 2016, with Executive A serving as its original Director, President, and Secretary.  Since its incorporation, POMC was wholly owned by Interocean Marine Corporation ("**Interocean**").  From October 20, 2016 through May 12, 2017,

Mr. de Cote held ownership interest in Interocean for the benefit of Executive A, as evidenced by the transaction documents resulting in the purchase and sale of the PO Yacht.  On or about January 20, 2017, Mr. de Cote resigned from POMC, and on May 12, 2017, he ceased being the nominee shareholder of Interocean.

123.    These documents, physical copies of which Plaintiff provided to the Receiver before the Receiver entered into the Consent Order, prove that Executive A was the beneficiary of the transactions resulting in the purchase and sale of the PO Yacht.

124.    Notably, the governing FinCEN SAR rule requires that a transaction be reported to FinCEN if, among other things, a bank has reason to suspect that

> the transaction has no business or apparent lawful purpose or is not the sort of which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction *after examining the available facts*, including the background and possible purpose of the transaction.

31 C.F.R. § 1020.320 (a)(2)(iii) (emphasis added).

125.    Here, a basic review of the documents available to the Bank (or that the Bank could have obtained by engaging with Plaintiff) would have caused the Bank to conclude that the transaction had a lawful business purpose (i.e., the purchase and sale of the PO Yacht for the benefit of Executive A).  For example, as noted above:

(a)    The Buyer's Auction Closing Statement ("**Closing Statement**") explicitly states that the Buyer was Mr. de Cote "as trustee for" Executive A.  The Closing Statement is also signed by both Executive A "as Beneficiary" and Mr. de Cote "as Trustee."

(b)    The 2016 MOU memorializes, among other things, the appointment of Mr. de Cote as Executive A's "nominee, trustee and fiduciary to participate in the live auction at the bankruptcy court of Pisa, Italy and to carryout [Executive A's] instructions with regard to" the PO Yacht.

(c)    The 2016 MOU also provides that Mr. de Cote will execute "all documents reasonably necessary to transfer all shares in that certain corporation named 'Interocean Marine Corporation' …, which shall be transferred and fully vested in [Executive A's] name."

(d)    Significantly, an insurance certificate, issued on October 19, 2016, covering the PO Yacht named Executive A as an "Additional Assured(s)" and specifically listed Executive A as the owner and loss payee.

126.    The facts set forth above, although not exhaustive, illustrate that the transactions evidenced by such documents did not warrant a SAR because there was nothing suspicious about the purchase and sale of the PO Yacht.

127.    By entering into the Consent Order, Driven admitted to erroneous facts such as these—that it should have known were untrue—and breached its fiduciary duty.

**I.    <u>Driven's Unauthorized Sales of Plaintiff's Art</u>**

128.    As Receiver, Driven currently manages the Bank's Artwork: a collection of approximately 91 original paintings, photographs, and sculptures by renowned artists that took over a decade to curate.

129.    Prior to the receivership, Plaintiff's representatives hand-picked each piece to create a collection that told a meaningful narrative.  The collection is intended to support Latin American artists through acquisition of important historical and cultural pieces.

130.    Before the Bank's liquidation, the Artwork could be viewed by members of the public who came into the Bank's main office.  Plaintiff's representatives also frequently lent certain pieces to museums and public exhibitions.

131.    The Artwork was last appraised in 2019 by Muriel Quancard.  Upon information and belief, Driven has not performed subsequent appraisals.

132.    Based on the 2019 appraisal, Plaintiff estimates that the Artwork is worth roughly $22.5 million.  This valuation does not take into consideration recent events that have undoubtedly increased the Artwork's value, such as the passing of the famous artist Fernando Botero, whose work constitutes a substantial portion of the collection.

133.    Pursuant to the terms of the Liquidation Plan, the Artwork may be sold if—and only if—funds are necessary to finalize the liquidation.  Otherwise, the Bank's remaining assets should be distributed to Plaintiff.

134.    Further, under the terms of the Receivership Order, Driven is required to ensure the avoidance of "any irreparable damage from being caused to the interests of [the Bank] …." and "direct its efforts and activities to (i) *maximize the value to be obtained for the sale or disposal of those assets*; [and] (ii) *minimize the amount of loss realized* in the resolution of the matters under its purview …."  Ex. A at 1, 8 (emphases added).

135.    On February 6, 2024, Driven's counsel informed Plaintiff in a comment bubble to a draft of the February 7 Agreement that "because BHC did not comply with its obligations under the [Settlement Agreement] to cause to transfer of the [Bank's] funds to the Escrow Account, the Receiver was forced to sell 2 [two] artworks in May 2023 in order to be able to pay for the settlement of the penalty claim under the contract with FIS from the [B]ank's systems for early termination of the contract."

136.    Upon information and belief, around May 2023, Driven reached a settlement with FIS—the provider of banking system software of the Bank—in order to terminate such service agreement for an amount between $900,000 and $1,200,000.

137.    On February 22, 2024, Driven's counsel informed Plaintiff of the names of the two pieces sold in May 2023, one of which was a Botero piece (the "**May 2023 Artwork Sales**").

Driven would not disclose the purchasers of the May 2023 Artwork Sales, but later informed counsel that they were sold for approximately $1.1 million (combined).

138.    On March 7, 2024, Plaintiff's representatives inspected the Artwork pursuant to the February 7 Agreement.  The inspection confirmed that the two pieces were no longer in the Bank's possession.

139.    The inspection also revealed that the Soto Pieces—which are valuable, kinetic art installations of suspended materials placed along the pictorial plane such that the piece changes shape with the viewer's movement—had been dismantled, destroying the essence of the work. Driven did not consult with Plaintiff nor its art curator, Muriel Quancard, prior to dismantling the Soto Pieces.

140.    Despite representations about needing money to sell these pieces, the weekly flow-of-funds reports ("**Flow of Funds**") provided by Driven show that it had sufficient funds to pay the FIS settlement at that time.  Notably, the May 8, 2023 Flow of Funds indicates that Driven had $2.9 million—over $1.7 million above the amount that, upon information and belief, was needed for the FIS settlement.

141.    The Flow of Funds surrounding the May 2023 period also do not contain any significant influxes or outflows of funds from the Bank's accounts, which suggests that Driven, in further breach of its duties to Plaintiff, either did not deposit the proceeds from the May 2023 Artwork Sales into the Bank's accounts, or did not actually receive any funds from the May 2023 Artwork Sales.

142.    Moreover, Plaintiff was uninformed about the sales.  This graph, depicting the Flow of Funds from April 20, 2023 to June 16, 2023, depicts how there was no way to determine the

works of art had been sold at the time, because the total balance of the accounts went down, not up.



143.    To the extent that Driven argues funds were needed at that time to pay the FIS settlement, such argument is wholly unsupported by the financial statements that were provided.

144.    Driven's May 2023 Artwork Sales and its dismantlement of the Soto Pieces, constitute breaches of fiduciary duty, conversion, professional negligence, and breach of Section 3701 of the PRGCA.

**J.    Driven's Flagrant Disregard for Its Fiduciary Obligations**

145.    As set forth above, Driven has continuously denied Plaintiff access to the Bank's books and records.

146.    Driven has prevented this access in order to prevent Plaintiff from uncovering and learning the extent to which the Receiver has grossly mismanaged the Bank's finances and in direct violation of Section 3650 of the PRGCA, which mandates that shareholders have a right to inspect a corporation's books and records.

147.    Because the Receiver has refused to permit Plaintiff to inspect the Bank's books and records, Plaintiff has been kept in the dark about the full extent of the Receiver's mismanagement, malfeasance, and waste.

148.    Further, the most recent Flow of Funds provided by Driven (from March 8, 2024) Flow of Funds shows the Bank has two remaining creditors that must be paid to finalize the liquidation: (i) FinCEN, which clearly would not be a creditor without Driven's decision to enter into a settlement agreement; and (ii) LW Casa de Valores.

149.    In this report, Driven represented to Plaintiff that as of March 8, 2024, two of the Bank's accounts—both of which Driven can access—held sufficient funds to pay these outstanding debts.   Therefore, the Liquidation Plan can be effectuated without any additional sales of the Artwork.

150.    Based on the limited information presently available to Plaintiff, it is clear that the Bank's finances and corporate assets have been grossly mismanaged by Driven.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

151.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

152.    Plaintiff was the Bank's sole shareholder at all relevant times related to the actions alleged herein.

153.    Plaintiff brings this action derivatively on behalf of and for the benefit of the Bank to redress injuries suffered by the Bank as a direct and proximate result of the breaches of fiduciary duty, professional negligence, violations of the PRGCA, and conversion.

154.    Although this action is brought derivatively on behalf of and for the benefit of the Bank, the Bank is properly joined as a nominal defendant because its interest are adverse to the

Plaintiff, given that Driven has seized control of the Bank and commandeers the Bank's actions *without* notice to, or input from, Plaintiff.

155.    As sole shareholder, Plaintiff will adequately and fairly represent the interests of the Bank in enforcing and prosecuting its rights.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

156.    The wrongful acts complained of herein subject, and will persist in subjecting, the Bank to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

157.    Apart from the litigation previously filed, Plaintiff has not made, until now, a formal demand on the Receiver—which is now in full control of the Bank (not the Board of Directors). The Receiver's control includes the decision to file or not file any "claim, lawsuit, or procedure on behalf of [the Bank]."  Thus, it is futile to seek the Receiver to pursue the claims set forth herein and such a pre-suit demand is therefore excused as a matter of law.

158.    Demands are excused as a matter of law where—as here—there exists reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment such that they are entitled to the protection of the business-judgment rule.  Defendant's actions were not the product of "independent" business judgment because, as alleged above, Defendant acted in bad faith and in breach of its fiduciary duties to the Bank and Plaintiff, its shareholder.

159.    Defendant also acted contrary to the legal duties imposed by the PRGCA.

160.    Thus, a demand on Defendant would be futile because it is Defendant itself that faces substantial risk of liability for acting in bad faith by breaching its fiduciary duty to Plaintiff, negligently exposing the Bank to legal risk and other liabilities, engaging in the unauthorized sale of corporate assets, and violating the laws of the Commonwealth of Puerto Rico.

161.    Accordingly, the demand requirement is excused as a matter of law.

## COUNT ONE

### Breach of Fiduciary Duty (Derivative)

162.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

163.    Driven owes Plaintiff the fiduciary duties of care, loyalty, and good faith, which require Driven to act in the best interests of Plaintiff, put the interests of Plaintiff before its own, discharge its actions in good faith, and exercise reasonable and prudent supervision over Plaintiff's management, practices, controls, and financial affairs.

164.    Driven breached its fiduciary duties to Plaintiff by willfully, recklessly, and intentionally failing to perform its fiduciary duties.

165.    Driven breached its fiduciary duty of care to Plaintiff by entering the Consent Order with FinCEN in bad faith and without conducting adequate due diligence.

166.    Driven was presented with information regarding the Bank's AML compliance, but intentionally ignored those facts by entering the Consent Order, which not only omits these facts but also makes false admissions antagonistic to Plaintiff's interests.

167.    Driven had a fiduciary duty to correct these omissions and false admissions prior to entering the Consent Order.

168.    Driven further breached its fiduciary duty of care to Plaintiff by unnecessarily expending funds in entering the Consent Order, which imposes an unjust civil money penalty upon Plaintiff that is disproportionate to the conduct at issue.

169.    Driven breached its fiduciary duties of loyalty and good faith by placing its interests above Plaintiff's in entering the Consent Order.  Instead of heeding Plaintiff's counsel and correcting the Consent Order's omissions and false admissions, Driven entered the Consent Order in bad faith and thus placed its interests above Plaintiff's.

170.    Driven further breached its duty of care to Plaintiff by engaging in the May 2023 Artwork Sales and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

171.    As a direct and proximate result of Driven's breaches of its fiduciary duties of care, loyalty, and good faith, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

172.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## **COUNT TWO**

### **Violations of Article 4.03 of the PRGCA (Derivative)**

173.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

174.    Driven owes Plaintiff the fiduciary duties of care, loyalty, and good faith, which require Driven to act in the best interests of Plaintiff, put the interests of Plaintiff before its own, discharge its actions in good faith, and exercise reasonable and prudent supervision over Plaintiff's management, practices, controls, and financial affairs.

175.    Driven breached its fiduciary duties to Plaintiff by willfully, recklessly, and intentionally failing to perform its fiduciary duties.

176.    Driven breached its fiduciary duty of care to Plaintiff by entering the Consent Order with FinCEN in bad faith and without conducting adequate due diligence.

177.    Driven was presented with information regarding the Bank's AML compliance, but intentionally ignored those facts by entering the Consent Order, which not only omits these facts but also makes false admissions antagonistic to Plaintiff's interests.

178.    Driven had a fiduciary duty to correct these omissions and false admissions prior to entering the Consent Order.

179.     Driven further breached its fiduciary duty of care to Plaintiff by unnecessarily expending funds in entering the Consent Order, which imposes an unjust civil money penalty upon Plaintiff that is disproportionate to the conduct at issue.

180.     Driven breached its fiduciary duties of loyalty and good faith by placing its interests above Plaintiff's in entering the Consent Order.  Instead of heeding Plaintiff's counsel and correcting the Consent Order's omissions and false admissions, Driven entered the Consent Order in bad faith and thus placed its interests above Plaintiff's.

181.     Driven further breached its duty of care to Plaintiff by selling the Artwork and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

182.     As a direct and proximate result of Driven's breaches of its fiduciary duties of care, loyalty, and good faith, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

183.     As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT THREE

### Professional Negligence (Derivative) Under Article 1536

184.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

185.     As Receiver, Driven has a duty to use such skill, prudence, and diligence as other members of the profession.  By virtue of this duty, Driven is required to exercise reasonable control and supervision over the Bank's agents, business, and operations; use sound business judgment in administering Plaintiff's financial operations; and accurately report to Plaintiff its financial affairs.

186.     Driven also has a duty under Article 4.07 of the PRGCA to conduct proper due diligence in order to prevent the publication of false information regarding the Bank's business.

187.     Driven breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order in bad faith and without conducting

34

adequate due diligence. Driven was presented with information about the Bank's AML/BSA compliance and background about key transactions, but intentionally ignored those facts by agreeing to enter the Consent Order, which omits these facts and makes false admissions antagonistic to Plaintiff's interests. Competent members of the receivership profession would have heeded Plaintiff's counsel and corrected these omissions and false admissions prior to entering the Consent Order.

188.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order without obtaining Plaintiff's consent and failing to share any drafts of the Consent Order with Plaintiff, pursuant to Article 1536 of the Puerto Rico Civil Code of 2020.

189.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by selling the Artwork and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

190.    As a direct and proximate result of Driven's breach of its duty to use such skill, prudence, and diligence as other members of the profession, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

191.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT FOUR

### Violation of Article 7.10 of the PRGCA (Derivative)

192.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

193.    Driven operated as the Board of Directors, or governing body, of the Bank and was obligated to comply with all laws applicable to the Bank.

194.    Under Article 7.10 of the PRGCA, shareholders of a corporation shall have the right to inspect the books and records of the corporation upon written demand, and if denied by the

corporation, the shareholders have the exclusive remedy to go to court to claim their rights under Article 7.10 of the PRGCA.

195.    Driven breached its duties under Article 7.10 when it ignored Plaintiff's April 24, 2023 written request, seeking to inspect the Bank's books and records.

196.    Driven further breached is duties under Article 7.10 when it failed to provide the Bank's books and records for inspection after Plaintiff's second written request, dated May 1, 2023.

197.    Driven further breached is duties under Article 7.10 when it failed to provide the Bank's books and records for inspection after Plaintiff's third written request, dated June 2, 2023.

198.    As a direct and proximate result of Driven's breach of Article 7.10, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value and remains unable to assess the extent of corporate waste caused by Driven.

199.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

**COUNT FIVE**

**Conversion (Derivative) Under Article 1536**

200.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

201.    As Receiver, Driven operated as the Board of Directors, or governing body, of the Bank and was obligated to comply with all laws applicable to the Bank.

202.    Driven also had a duty under Article 1536 not to deprive the Bank and its shareholder from the use and enjoyment of the Bank's property.

203.    Driven breached its duties and committed conversion when it engaged in the May 2023 Art Sales without prior approval from, or notice to, Plaintiff as sole shareholder.

204.    Driven further breached its duties and committed conversion when it caused the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

205.    As a direct and proximate result of Driven's breach and conversion under Article 1536 of the Puerto Rico Civil Code, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

206.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT SIX

### Breach of Fiduciary Duty (Direct)

207.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

208.    Driven owes Plaintiff the fiduciary duties of care, loyalty, and good faith, which require Driven to act in the best interests of Plaintiff, put the interests of Plaintiff before its own, discharge its actions in good faith, and exercise reasonable and prudent supervision over Plaintiff's management, practices, controls, and financial affairs.

209.    Driven breached its fiduciary duties to Plaintiff by willfully, recklessly, and intentionally failing to perform its fiduciary duties.

210.    Driven breached its fiduciary duty of care to Plaintiff by entering the Consent Order with FinCEN in bad faith and without conducting adequate due diligence.

211.    Driven was presented with information regarding the Bank's AML compliance and specific transactions, but intentionally ignored those facts by entering the Consent Order, which not only omits these facts but also makes false admissions antagonistic to Plaintiff's interests.

212.    Driven had a fiduciary duty to correct these omissions and false admissions prior to entering the Consent Order.

213.    Driven further breached its fiduciary duty of care to Plaintiff by unnecessarily expending funds in entering the Consent Order, which imposes an unjust civil money penalty upon Plaintiff that is disproportionate to the conduct at issue.

214.    Driven breached its fiduciary duties of loyalty and good faith by placing its interests above Plaintiff's in entering the Consent Order.  Instead of heeding Plaintiff's counsel and correcting the Consent Order's omissions and false admissions, Driven entered the Consent Order in bad faith and thus placed its interests above Plaintiff's.

215.    Driven further breached its duty of care to Plaintiff by selling the Artwork and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

216.    As a direct and proximate result of Driven's breaches of its fiduciary duties of care, loyalty, and good faith, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

217.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

**COUNT SEVEN**

**Violations of Article 4.03 of the PRGCA (Direct)**

218.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

219.    Driven owes Plaintiff the fiduciary duties of care, loyalty, and good faith, which require Driven to act in the best interests of Plaintiff, put the interests of Plaintiff before its own, discharge its actions in good faith, and exercise reasonable and prudent supervision over Plaintiff's management, practices, controls, and financial affairs.

220.    Driven breached its fiduciary duties to Plaintiff by willfully, recklessly, and intentionally failing to perform its fiduciary duties.

221.    Driven breached its fiduciary duty of care to Plaintiff by entering the Consent Order with FinCEN in bad faith and without conducting adequate due diligence.

222.    Driven was presented with information regarding the Bank's AML compliance and specific transactions, but intentionally ignored those facts by entering the Consent Order, which not only omits these facts but also makes false admissions antagonistic to Plaintiff's interests.

223.    Driven had a fiduciary duty to correct these omissions and false admissions prior to entering the Consent Order.

224.    Driven further breached its fiduciary duty of care to Plaintiff by unnecessarily expending funds in entering the Consent Order, which imposes an unjust civil money penalty upon Plaintiff that is disproportionate to the conduct at issue.

225.    Driven breached its fiduciary duties of loyalty and good faith by placing its interests above Plaintiff's in entering the Consent Order.  Instead of heeding Plaintiff's counsel and correcting the Consent Order's omissions and false admissions, Driven entered the Consent Order in bad faith and thus placed its interests above Plaintiff's.

226.    Driven further breached its duty of care to Plaintiff by selling the Artwork and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

227.    As a direct and proximate result of Driven's breaches of its fiduciary duties of care, loyalty, and good faith, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

228.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT EIGHT

### Professional Negligence (Direct) Under Article 1536

229.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

230.    As Receiver, Driven has a duty to use such skill, prudence, and diligence as other members of the profession.  By virtue of this, Driven is required to exercise reasonable control and supervision over the Bank's agents, business, and operations; use sound business judgment in administering the Bank's financial operations; and accurately report to Plaintiff, as the Bank's sole shareholder, its financial affairs.

231.    Driven also has a duty under Article 4.07 of the PRGCA to conduct proper due diligence in order to prevent the publication of false information regarding the Bank's business.

232.    Driven breached its duty to Plaintiff to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order in bad faith and without conducting adequate due diligence.  Driven was presented with information about the Bank's AML/BSA compliance and background about key transactions, but intentionally ignored those facts by agreeing to enter the Consent Order, which omits these facts and makes false admissions antagonistic to Plaintiff's interests.  Competent members of the receivership profession would have heeded Plaintiff's counsel and corrected these omissions and false admissions prior to entering the Consent Order.

233.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order without obtaining Plaintiff's consent and failing to share any drafts of the Consent Order with Plaintiff, pursuant to Article 1536 of the Puerto Rico Civil Code of 2020.

234.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession under Article 1536 of the Puerto Rico Civil Code by selling the Artwork and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

235.    As a direct and proximate result of Driven's breach of its duty to use such skill, prudence, and diligence as other members of the profession, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

236.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT NINE

### Violations of Article 4.07 of the PRGCA (Direct)

237.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

238.    As Receiver, Driven has a duty to use such skill, prudence, and diligence as other members of the profession.  By virtue of this, Driven is required to exercise reasonable control and supervision over the Bank's agents, business, and operations; use sound business judgment in administering the Bank's financial operations; and accurately report to Plaintiff, as the Bank's sole shareholder, its financial affairs.

239.    Driven also has a duty under Article 4.07 of the PRGCA to conduct proper due diligence in order to prevent the publication of false information regarding the Bank's business.

240.    Driven breached its duty to Plaintiff to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order in bad faith and without conducting adequate due diligence.  Driven was presented with information about the Bank's AML/BSA compliance and background about key transactions, but intentionally ignored those facts by agreeing to enter the Consent Order, which omits these facts and makes false admissions antagonistic to Plaintiff's interests.  Competent members of the receivership profession would have heeded Plaintiff's counsel and corrected these omissions and false admissions prior to entering the Consent Order.

241.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by entering the Consent Order without obtaining Plaintiff's consent and failing to share any drafts of the Consent Order with Plaintiff.

242.    Driven further breached its duty to use such skill, prudence, and diligence as other members of the profession by selling the Artwork and causing the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

243.    As a direct and proximate result of Driven's breach of its duty to use such skill, prudence, and diligence as other members of the profession, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

244.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

## COUNT TEN

### Violation of Article 7.10 of the PRGCA (Direct)

245.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

246.    Driven operated as the Board of Directors, or governing body, of the Bank and was obligated to comply with all laws applicable to the Bank.

247.    Under Article 7.10 of the PRGCA, shareholders of a corporation shall have the right to inspect the books and records of the corporation upon written demand.

248.    Driven breached its duties under Article 7.10 when it ignored Plaintiff's April 24, 2023 written request, seeking to inspect the Bank's books and records.

249.    Driven further breached is duties under Article 7.10 when it failed to provide the Bank's books and records for inspection after Plaintiff's second written request, dated May 1, 2023.

250.    Driven further breached is duties under Article 7.10 when it failed to provide the Bank's books and records for inspection after Plaintiff's third written request, dated June 2, 2023.

251.    As a direct and proximate result of Driven's breach of Article 7.10, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value and remains unable to assess the extent of corporate waste caused by Driven.

252.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

**COUNT ELEVEN**

**Conversion (Direct) Under Article 1536**

253.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

254.    As Receiver, Driven operated as the Board of Directors, or governing body, of the Bank and was obligated to comply with all laws applicable to the Bank.

255.    Driven also had a common law duty not to deprive the Bank and its shareholder from the use and enjoyment of the Bank's property.

256.    Driven breached its duties under Article 1536 of the Puerto Rico Civil Code committed conversion when it engaged in the May 2023 Art Sales without prior approval from, or notice to, Plaintiff as sole shareholder.

257.    Driven further breached its duties under Article 1536 of the Puerto Rico Civil Code and committed conversion when caused the depreciation of other Bank assets through its dismantlement of the Soto Pieces.

258.    As a direct and proximate result of Driven's breach of Article 1536 of the Puerto Rico Civil Code and conversion, as alleged herein, Plaintiff has sustained and continues to sustain significant damages and a drastic diminution in value.

259.    As a result of the misconduct alleged herein, Driven is liable to Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to enter an order and judgment for Plaintiff and against Defendant granting the following relief:

(a)    Enjoining Driven, and anyone acting on its behalf, from further violating its fiduciary duties to the Bank;

(b)    Requiring Driven to comply with its statutory obligations under the PRGCA and all other applicable laws;

43

(c)    Requiring Driven to provide Plaintiff the books and records that have previously been requested in connection with the issues alleged in this Complaint;

(d)    Allowing Plaintiff unfettered access to books and records of the Bank on a going-forward basis;

(e)    Awarding money damages for Driven's violation of fiduciary duty and professional negligence in an amount to be determined at trial exceeding $75,000;

(f)    Enjoining Driven from selling, transferring, damaging, or otherwise disposing of the Artwork;

(g)    Replacing Driven as receiver for the Bank with an independent and neutral third party;

(h)    Holding Driven's representatives who are deemed to have caused the publication of the Consent Order's false statements jointly liable under Article 4.07 of the PRGCA for the reputational and financial harm bestowed on Plaintiff;

(i)    Awarding Plaintiff its costs and expenses incurred in this litigation, including attorneys' fees, expert fees, and costs; and

(j)    Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 14, 2024                    Respectfully submitted,


                                        /s/Alberto G. Estrella

                                        **ESTRELLA, LLC**

                                        Alberto G. Estrella
                                        USDC-PR Bar No. 209804
                                        PO Box 9023596

San Juan, PR 00902-3596
Tel: (787) 977-5050
Fax: (787) 977-5090
agestrella@estrellallc.com

Stephanie M. Vilella
USDC-PR Bar No. 308603
PO Box 9023596
San Juan, PR 00902-3596
Tel: (787) 977-5050
Fax: (787) 977-5090
svilella@estrellallc.com

**WINSTON & STRAWN LLP**

Abbe Lowell
(admitted *pro hac vice*)
DC Bar No. 358651
1901 L Street, NW
Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
abbelowellpublicoutreach@winston.com

Richard Weber
(admitted *pro hac vice*)
NY Bar No. 2465094
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-1718
Fax: (212) 294-4700
rweber@winston.com

Elizabeth Ireland
(admitted *pro hac vice*)
NC Bar No. 47059
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
eireland@winston.com

*Attorneys for Plaintiff Bancrédito Holding
Corporation*

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Luis Augusto Zapata, of legal age, married, resident of Miami, Florida, and President/ Chief Executive Officer of Bancrédito Holding Corporation, do hereby attest that I have read the above information and examined the Verified Complaint, and that the above is true to the best of my knowledge. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Miami, Florida on March 14, 2024.

Luis Augusto Zapata